No. 22,592.

JOHN M. ALEXA, *Appellant*, v. KATHERINE ALEXA, as an Individual and as Executrix, etc., and ANNA ALEXA, *Appellees*.

SYLLABUS BY THE COURT.

1. SPECIFIC PERFORMANCE—*Agreement of Father to Give His Property to His Son—Request for Separate Conclusions of Fact and Law.* The record examined, and *held,* that the special findings of fact made by the trial court fully complied with the rule of the code requiring separate conclusions of fact to be stated in writing when requested by a litigant, and *held,* that no error transpired in the trial court's refusal to adopt those submitted by the plaintiff.

2. SAME—*Nature of Special Findings Required by Statute.* The special findings which the code directs the trial court to state in writing, at the request of a litigant, are those which deal with the ultimate facts upon which the rights of the parties directly depend and from which the correctness of the judgment can obviously and readily be ascertained, not the merely evidentiary facts upon which the ultimate facts in issue are established.

3. SAME—*Request for Separate Conclusions of Law and Fact—Requirement of Code Satisfied by the Conclusions Found.* In an action to enforce an alleged oral contract between plaintiff and his parents in which it was agreed that he was to have all his father's property at his father's death, subject only to a life estate in his mother's favor if she survived her husband, the code requirement (Civ. Code, § 297, Gen. Stat. 1915, § 7197) that conclusions of fact be made separately from the trial court's conclusions of law, when requested by either party, was satisfied when the trial court found separately, upon competent and sufficient evidence, that there never was any such agreement between plaintiff and his parents.

Appeal from Washington district court; JOHN C. HOGIN, judge. Opinion filed December 11, 1920. Affirmed.

*Edgar Bennett,* of Washington, *W. J. Gregg,* of Frankfort, and *W. W. Redmond,* of Marysville, for the appellant.

*Charles Smith, A. J. Freeborn,* both of Washington, and *Charles L. Hunt,* of Concordia, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: The plaintiff brought this action against his mother and sister to set aside a will which his father had made in his mother's favor, and to set aside a deed made by his mother conveying to his sister 200 acres of certain lands which had been bequeathed to his mother by his father's will.

Plaintiff claimed that the will was made in fraud of his rights under an oral agreement between him and his parents made in 1893 whereby he was to have all his father's property at his father's death, subject only to a life estate for his mother if she survived his father. Plaintiff's petition recited at length that in 1893 his father was heavily in debt and that his creditors were pressing him for payment; that he, plaintiff, was then 29 years old and that he had determined to shift for himself; and that his father and mother promised him that if he would remain on the farm and live thereon until his father's death and use his best efforts to aid in the payment of the indebtedness that he should have all his father's property, subject only to a life estate in his mother's favor if she outlived her husband.

The family, at home in 1893, consisted of the father aged 67, the mother aged 61, a young sister Anna who taught school and boarded at home, and the plaintiff. The father was afflicted with rheumatism and overweight, and was incapacitated for further labor.

Plaintiff alleged that pursuant to this oral agreement he indorsed his father's obligations and labored on the farm for many years and did help to pay off the indebtedness, and had fully performed his part of the contract, and had wholly shaped his life in conformity thereto, and when he married, in 1902, he established his own domicile in his father's dooryard until his father's death in 1916, and still resides thereat.

The mother's and daughter's separate answers denied this alleged agreement, and also recited at length a good deal of the family's business relations for this long period; and the daugh-

ter prayed that her brother, the plaintiff, be dispossessed and her title quieted to that part of the farm conveyed to her by her mother.

The abstract and counter-abstract of the record are long, but they present no difficult legal problems. The trial court refused to make some 34 findings of fact requested by plaintiff, covering nine pages of the abstract, but made the following instead:

"FINDINGS OF FACT.

"1. That in 1893 John Alexa was not heavily involved financially in comparison with his resources.

"2. That he was not being pressed by his creditors for the payment of his obligations to a greater extent than was usual in ordinary business affairs at that time; that his creditors were making no extraordinary demands upon him for payment but were urging payment of his loans as they urged the payment of loans by other customers; and there was no threat by any of his creditors to close him out if he did not pay, and the extensions in time of payment were not granted by any of his creditors on account of the management of his financial affairs being in part turned over to the plaintiff.

"3. That because of the increasing age and growing physical disability he turned the active management of his farm and business affairs over to his son, John M. Alexa, the plaintiff herein, retaining in himself the final control and decision in all things.

"4. That plaintiff managed said property, under the control of his father, from 1893 to 1904, took possession of the profits and proceeds thereof, kept the proceeds in banks in his own name and disbursed the same to suit himself.

"5. That in 1904 plaintiff discontinued the management of his father's business, thereafter rented a part of the land himself and assisted his father in renting the remainder.

"6. That in 1904 John Alexa was still in debt to an amount exceeding $2,500.00.

"7. That plaintiff married in 1902, and thereafter and up to the present time has resided in a separate dwelling in the dooryard of John Alexa's home.

"8. That plaintiff prior to 1893 received from his parents his living, spending money, and cash to pay for the 40 acres of land preëmpted by him; that between 1893 and 1904 he had full charge of his father's property and used it pretty much as he pleased, and that from 1902 to the death of his father in 1916 he engaged extensively in farming and stock raising, and had free use of his house and improvements on his father's farm, including feed yards, buildings, fences and pasture, for which he paid no rent or other consideration.

"9. That the improvements which plaintiff placed upon the farm of John Alexa were very largely drawn from said farm or its proceeds.

Alexa v. Alexa.

"10. That in 1892 (1902) plaintiff acquired 232 acres of land in his own name (exclusive of the 40 acres of preëmpted land) and with the aid of John Alexa and from the use of John Alexa's farm paid for said land, at least $2,000.00 of John Alexa's money going into this land.

"11. That plaintiff was a faithful, hard-working son, kind to his father and doing what he reasonably could to minister unto his father's needs and comfort.

"12. That defendant, Anna Alexa, lived at home from 1885 to the time of the commencement of this action; that she never married; that she taught school over 30 years, nearly all that time living at home and assisting in the housework and the care of her aged father and mother, contributing from her limited income to the common expenses of the home and at times helping her brother, the plaintiff.

"13. That defendant, Anna Alexa, was a faithful, hard-working daughter, kind to her parents, and doing what she reasonably could to minister to their ·needs and comfort.

"14. That since 1916 the defendant, Katherine Alexa, has been bed-ridden and has had the constant care, day and night, of the defendant, Anna Alexa.

"15. That during his life John Alexa made many statements as to what he was going to do with his property, to-wit, 'that he was going to leave the farm to the plaintiff,' 'that he would leave the farm to the plaintiff and require him to pay certain sums to the other heirs'; 'that he would leave his property all to his wife and if the children did not do right she could do what she pleased with it'; 'that he would give Anna 80 acres and a house and lot in Hanover'; 'and that he would give Anna the homestead.'

"16. That in 1901 John Alexa made a will, the contents of which are not disclosed by the evidence, and which was destroyed prior to 1904.

"17. That in 1904 John Alexa made a will providing that after the payment of his indebtedness all his property of every nature whatsoever should go to his wife, Katherine Alexa, absolutely; making her the executrix of said will, and giving her full power to sell and convey; that on January 13th, 1917, said will was probated, the plaintiff and defendant, Anna Alexa, participating in the said probation and both being fully advised of the contents and force of said will, and neither making any objections thereto; and that on January 16th, 1917, the defendant, Katherine Alexa, as the widow of John Alexa, elected to take under said will and not under the law.

"18. That on February 10th, 1917, the defendant, Katherine Alexa, conveyed by warranty deed to the defendant, Anna Alexa, the East Half of the North-west Quarter, East Half of the Southwest Quarter and Southwest Quarter of the Northeast Quarter of Section Eight, in Township Three, South, of Range Five, East of the Sixth P. M., being a part of the land in controversy in this action and a part of the land willed to Katherine Alexa by John Alexa, deceased.

"19. That E. ½ N. W. ¼ and E. ½ S. W. ¼ of Section Eight, Township Three, South, Range Five, East, was used and occupied by John

Alexa as a homestead prior to 1893 and up to his death; and by his widow, Katherine Alexa, his daughter, Anna Alexa, and his granddaughter, Anna Pacenka, until February 10th, 1917, since which time the widow and her granddaughter, Anna Pacenka, have continued to reside on said land with the defendant Anna Alexa.

"20. That there was never any agreement, either oral or written, between John Alexa and the plaintiff, or between John Alexa and his wife, the defendant, Katherine Alexa, and the plaintiff, by the terms of which the plaintiff was to become owner of the lands and other property of John Alexa at his death, subject to the life use thereof by Katherine Alexa.

"21. That Katherine Alexa never agreed to any contract between John Alexa and the plaintiff, John M. Alexa, by which, upon the performance of certain conditions, John M. Alexa was to become the owner of all the property left by John Alexa at his death, subject to a life estate in her."

"CONCLUSIONS OF LAW.

"1. That the defendants, Katherine Alexa and Anna Alexa, do not hold the property of John Alexa, deceased, in trust for the plaintiff, John M. Alexa; and that said plaintiff should recover nothing in this action.

"2. That the plaintiff estopped himself from claiming under his alleged contract with John Alexa by submitting in the probate of the will of John Alexa, deceased, without objection on his part and without making any claim on his part under his alleged contract.

"3. That the contract alleged by plaintiff, even if it existed, should not be enforced for the reason that under the facts in this case its enforcement would be inequitable, unjust and not required by good conscience or natural justice.

"4. That the E. ½ N. W. ¼ and E. ½ S. W. ¼ of Section 8, Township 3, South, Range 5, East, was the homestead of John Alexa and his wife, Katherine, and could not be contracted away by John Alexa without the consent of his wife, Katherine, and which consent was never given.

"5. That defendant, Anna Alexa, is the owner and should have immediate possession of the E. ½ N. W. ¼, E. ½ S. W. ¼ and S. W. ¼ N. E. ¼ of Section 8, in Township 3, South, Range 5, East; and her title to said land should be quieted as against the plaintiff, John M. Alexa, and anyone claiming under or through him.

"6. That defendant, Katherine Alexa, is the owner and should have immediate possession of all property of which John Alexa died seized."

Judgment was entered accordingly, and plaintiff appeals.

His chief complaint centers about the refusal of the trial court to make the 34 findings of fact submitted by him. He contends that they were "material pertinent, issuable facts," based on the pleadings and supported by evidence. The one important and controlling fact in issue was whether plaintiff's father and mother had ever made an ageement with him

Alexa v. Alexa.

in 1893, as he alleged, to give him all the property at their death. All else was mere evidentiary detail. His mother, whose evidence the trial court believed instead of his, denied that any such agreement had ever been made. She deposed:

"In March 1893, there were no debts that bothered my husband at all; the financial affairs of our family were common knowledge within the family during our married life; we were in very good financial condition at that time; my husband told me all of that; my husband's debts were never worrying him.

"My son, John M. Alexa, had control and the full management of my husband's farm and business; during the time that my son, John, was managing the farm, my husband, John Alexa, did not exercise control over him and over the affairs of the farm. My husband had control of the farm and everything.

"I did not at any time during the time my son was living on this farm make an agreement with him that if he would stay on the farm and work it that at my death I would give him all of the property that belonged to me, keeping only a life estate for myself; and I never did tell my son, John Alexa, that at my death he was to have all my property; and I never heard my husband at any time during the time that our son, John Alexa, worked on the farm, or was on the farm, that he, my husband, would give all of his property to his son, John M. Alexa, leaving only a life interest to me; and I never heard my son, John M. Alexa, during my husband's lifetime and during the time that he was working there, claim that his father was going to give all of his property to my son, John, and leave me only a life interest in it; I never signed any contract or will or deed giving my son all of the property at my death; I never signed any consent to that will or other paper, or agreement to anything of the kind, never made a scratch.

"Whenever he felt like working he did, and when he didn't, he didn't.

"We got along fairly well all these years so far as I know; we left him do as he pleased so we got along well; John and I were always on good terms but I had to assume lots of bitterness sometimes on my heart and brain, couldn't say what it was about, him and my husband sometimes got in a row and I'd be getting for it; those rows were always since John's marriage.

"REDIRECT EXAMINATION.

"A few days after I made the deed of the land to Anna, I had a conversation with John M. Alexa at my home; he came up and told me that I sold my roof from above my head and that further I told him that I still had a hundred and twenty acres that I meant to do something with; I meant to give him those hundred and twenty acres and that he told me that now I could eat them up, eat them up like an animal. He never talked anything about my husband and myself having promised to give him all our property at the time of our death.

"I thought when I gave Anna that I would also give him when I did not need it any more, but when he told me to eat it up I cannot give it to him."

It is not our purpose, however, to reproduce or summarize all the evidence. On appeal, it is always sufficient to sustain a judgment which must be based on a controlling issue of fact that the record contains substantial though controverted evidence to support that judgment. (*Bruington v. Wagoner*, 100 Kan. 439, 164 Pac. 1057.) Since the paramount question in issue—the existence or nonexistence of an oral agreement made between plaintiff and his parents in 1893 that he should have all his father's property, subject to his mother's life estate, at his father's death,—was determined adversely to plaintiff, many of the requested findings of fact which the trial court declined to make became immaterial. Thus, it is immaterial what particular lands plaintiff's father owned in 1893, or to what extent these lands were incumbered; the situation of the family, their ages and abode, were not in dispute; it was not important what family arrangement prompted the sister, Anna, to remain a country-school teacher so as to reside with her parents, nor what was the market value of the family property in 1893; and it is altogether immaterial, if true, that prior to 1893 plaintiff worked as a laborer for his father for eight years without compensation "except his board and clothes and a small amount of spending money and $120" used to pay for 40 acres of land. Touching the requested finding relating to his father's alleged conversations with the creditors, and the alleged extensions of credit based thereon (refused findings 11-14), it was proper for the trial court to refuse to make such findings if he disbelieved the evidence proffered in their support; nor should we marvel at that as the evidence was somewhat hazy and uncertain, and was so completely overthrown by the mother's testimony, by many circumstances, and by various significant incidents which developed in the course of the protracted trial. And these observations are pertinent even in the consideration of the depositions which, though they did tend to show some sort of bargain between plaintiff and his father in 1893, were materially weakened by cross-examination and entirely overthrown by other evidence. Thus, Tobey, a retired banker, formerly of Washington county, now residing in Maine testified:

Alexa v. Alexa.

"Q. Do you recall any statement made by John Alexa to Mr. Stackpole in the month of March, 1893, relating to this indebtedness—any other statement? A. There was some talk about his father either deeding him or willing him a part of his farm—some of the land—in consideration of his helping to pay the indebtedness, but just what the conversation was I could not say. . . . As I remember, he was to have either the farm or a portion—I do not remember he was to have the whole of it. I do remember he was to be—his father secured him in that way—with a promise of that kind. There was some such promise but it is quite a while ago and I—as I said—Mr. Stackpole did most of the work, had most of the talk with the two Alexas. Of course I heard some of it and I know about the transaction.

"Q. Tell anything that you know that you heard—that you remember having heard in relation to the arrangements between John Alexa, sr., and John M. Alexa. A. The sum and substance was—John M. Alexa was to help his father pay the debt and his father was to either give by deed or will a part of the land—I do not remember how much, whether it was all or part. . . .

"Cross-examination. . . .

"Q. And was there anything more in substance to these conversations than that the young man was to help his father out, and the father would see that he was compensated in some way for whatever he did? A. Yes, sir; that was substantially as I remember it. . . .

"Q. And during the failure of crops and hard times he managed his affairs and was not seriously financially embarrassed, to your knowledge? A. No, I do not think he was."

Another retired banker of Washington county, F. A. Taft, now residing in California, deposed:

"Q. You may state what that arrangement was. A. Mr. Alexa informed my father that in the future most business transactions would be conducted by his son, Mr. John M. Alexa.

"Q. Why did he say this was to be done? A. Because he was growing unable to attend to things and John was his only boy at home, and entirely honest and competent. . . .

"Q. You may state what he said that arrangement was. A. His son John was to have the place and the property upon the death of himself and his wife and in the meantime was to assume full management of the same. . . .

"Cross-examination. . . .

"Q. Did you or your bank at any time in 1893 or 1894, or about that time, make the extension of the indebtedness contingent or conditional upon young John assuming the management of the place? A. That was the agreement, but if you ask whether we took the initiative in requiring this, we did not.

"Q. There was on the part of you and your bank no coercion upon the old gentleman to have his son take the management of the place? A. There was not. . . .

"Q. You did not require it? A. We did not require it. . . .

"Q. Do you know how much young John owned in his own name in 1893? A. We understood he owned a small tract, perhaps say forty acres. . . .

"Q. Were you or your bank in 1893 pressing old John for payment of his indebtedness? A. We urged him with others to reduce his indebtedness.

"Q. Did you in 1893, or at any other time, threaten him that unless he turned the management of his farm over to his son John you would close him out? A. We did not. . . .

"Q. And from 1893, and up until the time you left Kansas, young John, by the management of the business in that way, had increased his own personal real estate from forty acres to two hundred and forty, had he not? A. Yes, sir."

It will be noted that the conversation between plaintiff's father and the elder Taft, even if it was truthfully and accurately detailed by the deponent, did not square with the contract sued on—an agreement between the father *and mother* and himself that he was to have all his father's property subject to a life estate for his mother. Nor did that conversation pretend to recite the contract nor its consideration. Neither of the retired bankers testified to any fact which would show an agreement to which plaintiff's mother was a party, and we have no other agreement to consider.

Counsel call attention to the rule enforced in *Nordman v. Johnson,* 94 Kan. 409, 146 Pac. 1125. That case, including Mr. Justice Burch's dissenting opinion, is an instructive discussion on the trial court's duty to make special findings of fact at the request of a litigant. While disagreeing in the application of the rule itself, the majority and minority opinions agreed that the special findings required by the code are those which deal with the ultimate facts upon which the rights of the parties directly depend and from which the correctness of the judgment can obviously and readily be ascertained, not the merely evidentiary facts upon which the ultimate facts in issue are to be established. Tested by this rule, the special findings which were made by the trial court descended into even greater detail than the rule required. The one finding, No. 20, that there never was any such agreement between plaintiff and his parents as sued on, was a finding on the only controlling, ultimate, issuable fact discernable in this lawsuit (*In re Appeal*

*from Survey*, 106 Kan. 222, 187 Pac. 677), and ·all else was mere evidentiary detail.

There is no error in the record, nor does a careful perusal of it arouse any misgivings as to the justice of the net result, and the judgment is affirmed.