Sharp v. Losee.

No. 22,725.

WILLIAM SHARP, *Appellee*, v. NETTIE B. LOSEE, *Appellant*, et al.

SYLLABUS BY THE COURT.

1. ABSTRACT OF RECORD—*What It Should Not Contain.* An abstract prepared for appeal should be restricted to such portions or abridgment of the record as may be necessary to a complete understanding of the specific errors relied on for a reversal of the judgment; and it should not be interlarded with comment of counsel. Such comment or argument should appear only in his brief.

2. PLEADINGS—*Objections to Petition—How Raised.* The plaintiff's petition examined, and held to be not subject to the objections lodged against it; and held, also, that such objections should have been raised by demurrer.

3. WILL—*Action to Set Aside—Objection to Petition Should Be Raised by Demurrer or Motion.* An objection to the sufficiency of the allegations of plaintiff's petition concerning defendant's undue influence in procuring the making of a testator's will should be raised by demurrer or by motion to make more definite and certain; and when neither such demurrer nor motion is filed, and the defendant joins issue, and the cause is fully tried, and the defendant makes no showing that she was surprised by the nature of the evidence adduced in

support of plaintiff's allegations, such objection and the court's adverse ruling thereon form no basis for reversible error.

4. SAME—*Evidence—Interested Witness May Testify.* However great may be the interest of a witness in the outcome of a civil lawsuit, such interest does not disqualify him from testifying. (Civ. Code, § 317.)

5. SAME—*Action to Set Aside Will—Evidence Shows Mental Incapacity of Testator.* The record examined, and held that plaintiff's allegations touching the testator's mental incapacity to make a will at the time of its execution was fully sustained by the evidence.

6. SAME—*Will Made Through Undue Influence of Defendant.* The findings and judgment that the will was made through the undue influence of the defendant were sufficiently supported by the evidence.

7. SAME—*Will Set Aside on Ground of Defendant's Undue Influence—Defendant Not Concerned in Alleged Error in Establishing Plaintiff's Claim to Decedent's Property.* When the plaintiff, who was the sole heir at law of his father, brings a suit against the beneficiaries of his father's will and against the executor named in the will, alleging the want of testamentary capacity and undue influence, and that the will was executed in violation of a contract between plaintiff and his father, and the trial court finds upon competent and sufficient evidence that the father lacked testamentary capacity, and that the will was procured to be made through the undue influence of one of the defendant beneficiaries, and the other beneficiaries and the administrator acquiesce in the trial court's judgment and do not appeal therefrom, the beneficiary whole sole interest in the controversy was founded upon the will which was adjudged to have been procured through her undue influence has no concern with possible errors in the trial which related solely to the matters involved in the alleged contract between plaintiff and his father.

8. SAME—*No Misconduct of Court Shown.* The record does not sustain the appellant's charges of misconduct of court or counsel.

9. SAME—*Action to Set Aside Will—Jury Acts Only in Advisory Capacity.* In an action to set aside a will, where a jury is called, it serves only in an advisory capacity; and the court is at liberty to adopt, reject, amplify or modify the jury's findings; and the findings which control the judgment are those which are made by the trial court itself or those of the jury which the trial court approves of, or both.

10. SAME—*Uncontradicted Evidence May Be Disregarded When.* Rule followed that a judgment supported by substantial and sufficient evidence is to be upheld on appeal, regardless of the evidence to the contrary which did not receive credence in the trial court.

11. SAME. Rule followed that a trial court or jury is not necessarily bound to believe testimony which was not directly contradicted by other evidence.

Sharp v. Losee.

12. SAME—*Son Born in Lawful Wedlock—Evidence of Legitimacy.* While the fact that a son is born to his parents in lawful wedlock is not conclusive proof of his legitimacy, it is evidence of a very high order, and it is not overthrown because when his father was angry, drunk or irrational, the father applied the epithets of "bastard," "liar" and "thief" to the son.

13. SAME. The record examined, and held to establish the legitimacy of the son.

Appeal from Gove district court; ISAAC T. PURCELL, judge. Opinion filed June 11, 1921. Affirmed.

*Charles F. Miller,* of Denver, Colo., for the appellant.

*George W. Holland,* of Russell, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This was an action to set aside the will of Frank Sharp, late of Gove county. The plaintiff, William Sharp, who was the only son and heir of the testator, charged that his father was mentally incapable of making a will, that the will was made through the undue influence of the defendant, Nettie B. Losee, and another, and that the will was made in violation of a contract between plaintiff and his father by the terms of which plaintiff was to receive all his father's property at his decease.

The will provided certain substantial bequests to various persons who were all made defendants, but all these parties have dropped out of this lawsuit except Nettie B. Losee and the plaintiff to whom the will bequeathed—

"I. To Nettie B. Losee, my daughter in law of Denver, Colo., the sum of Two Thousand Dollars.

.    .    .    .    .    .    .    .    .    .    .    .    .    .

"IV. To my son Wm. F. Sharp of Ball P. O. Gove County, Kansas, the sum of ten dollars and all the personal property belonging to me now on the farm where he resides."

An advisory jury was called to assist the trial court in ascertaining the facts. The jury returned answers to 25 special questions, Nos. 22 and 23 reading—

"22. Was the execution of the will in question procured by the undue influence of any person or persons, and if so, by whom was such undue influence exercised? Ans. Yes, by Nettie B. Losee.

"23. If you find that undue influence was exercised, state fully of what such undue influence consisted, and what acts constituted it, and when they were done? Ans. By inducing Frank Sharp to sell out and get his property into cash and come and live with her (Nettie B. Losee) in Denver Colorado."

The trial court adopted the answers of the jury to all the questions except Nos. 3 and 19. These read:

"3. Was Frank Sharp of sound or unsound mind at the time of the alleged making of the will? Ans. Cannot decide.

.    .    .    .    .    .    .    .    .    .    .    .    .

"19. Did the testator at the time of the execution of the will, possess sufficient mental capacity to understand the nature of the act in which he was then engaged? Ans. Cannot decide."

The answers to these two questions were set aside and the trial court itself made extended findings thereon, which in substance were that the testator at the time of making his will and for long prior thereto was a person of unsound mind and incapable of making a will.

The trial court also amplified and modified the jury's finding No. 23, touching the nature and extent of the undue influence exerted upon the testator by Nettie B. Losee.

The jury's findings Nos. 24 and 25 read:

"24. Was there a contract between plaintiff and his father concerning the disposition of his father's property? Ans. Yes, verbal.

"25. If you answer the last preceding question 'yes' then state:

"(a) When was such contract entered into? Ans. Fall of year 1914.

"(b) State fully what the plaintiff, William B. Sharp, agreed to do as a consideration for said contract? Ans. Stay on the farm and make a home for his father.

"(c) What did the deceased, Frank Sharp, agree to do? Give the language of the promise which he made. Ans. All of my real and personal property when I am done with it shall go to Bill.

"(d) State fully what acts plaintiff performed in fulfilling his portion of said contract? Ans. Stayed on the farm and made a home for his father.

"(e) If you find that the plaintiff did acts in performing his portion of the contract, over how long a period of time did the acts extend? Ans. From the time contract was made until his father voluntarily left."

The trial court found for the plaintiff on all the issuable facts, held the will void, and adjudged the plaintiff to be the owner of all the testator's real and personal property.

The defendant, Nettie B. Losee, appeals. She makes twenty-

three specifications of error but no attempt is made in the brief of her counsel to follow that outline. However, we have carefully perused her abstract, brief and reply brief, and we have also resorted to the original files and to the transcript; and we will endeavor to note the matters of which she makes complaint in the order of their discussion. We must, however, remark that an abstract should not be interlarded by comment of counsel. The abstract should be restricted to such portions or abridgment of the record as may be necessary for us to consult in order to understand the specific errors assigned and relied on for reversal of the judgment; and in the perusal of the abstract we should not have to determine whether we are reading the record, or merely the interpolated comment of counsel upon the record. The comment of counsel should appear only in his brief and argument.

It is first urged that the petition was not sufficient to constitute a cause of action. This should have been raised by a demurrer, and no demurrer was filed. On the contrary, the defendant joined issues by filing an answer. It is said:

"Neither the day, month nor year, nor the date of the death of Frank Sharp, nor the day, month or year, nor the date when the will is alleged to have been made or executed is alleged with reasonable certainty nor at all."

We discover no such infirmity in the petition. Plaintiff's petition, count 1, alleged:

"That on or about the 8th day of July, 1917, one Frank Sharp, a resident of Gove County, Kansas, died leaving a certain instrument in writing which said defendants allege to be his last will and testament."

A copy of the alleged will was attached to plaintiff's petition and it showed that it was executed on June 19, 1917.

Defendant criticizes that portion of the petition which pleaded the oral contract between the deceased and his son whereby the latter was to have all his father's property at his death if the son would remain on the farm and make a home for his father. But unless the other grounds on which the will was held void should fail—testamentary incapacity and undue influence—that phase of this lawsuit will not greatly concern this defendant; so for the present that feature of the appeal will be laid aside.

It is next urged that the allegation of undue influence was

not sufficiently pleaded. This might have been a point of some merit if raised by demurrer (*Ladd v. Nystol*, 63 Kan. 23, 64 Pac. 985) or by motion to make the petition more definite and certain, but when issues were joined and the matter tried out, and no showing made of surprise or prejudice by reason of the evidence adduced thereon, it furnishes no basis for reversible error. In *Kinne v. Waggoner*, 108 Kan. 814, 197 Pac. 195, it was said:

"Where the prolix, defective and inconsistent allegations in the pleadings of the plaintiff are clarified by the pleadings of the defendant, and defendant's pleadings show that he has not misunderstood the issue between the parties, it is not error to overrule objections to plaintiff's petition nor to overrule objections to the introduction of evidence." (Syl. ¶ 1.)

The next assigned error which we note in defendant's brief reads:

"The court erred in allowing Will Sharp to be sworn and testify over defendant's objections and exceptions, as being a party to the suit, plaintiff, and therefore, incompetent."

Here is no error. Our civil code, section 317, provides:

"No person shall be disqualified as a witness in any civil action or proceeding by reason of his interest in the event of the same, as a party or otherwise, or by reason of his conviction of a crime; but such interest or conviction may be shown for the purpose of affecting his credibility."

It is contended that "the record discloses plaintiff's entire failure to establish any of the allegations of the petition." This contention is far from correct. The testimony of several witnesses, some of whom had known the testator for thirty or forty years, was to the general effect that during the last few years of his life Frank Sharp was an irrational, maudlin, drunken reprobate, so coarse and obscene in his language and conduct that mental and moral irresponsibility alone could reasonably explain his depravity. True, scarcely any of these witnesses had seen him during the last months of his life after he left Gove county and took up his abode with defendant in Denver. But it would be contrary to human experience that a man of Sharp's advanced age, 77 years at his death, who was and had been mentally unbalanced for years would recover his mental equilibrium and reacquire testamentary capacity less than a month before he died. (*Lantis v. Davidson*, 60 Kan. 389, 56 Pac. 745; *Howard v. Carter*, 71

Sharp v. Losee.

Kan. 85, 91, 80 Pac. 61.)   Furthermore, the record is not wanting in evidence that his mental incapacity continued after he went to Denver.   In November, 1916, an old acquaintance of the testator was in Denver and had a conversation with defendant:

"Q. Did you have any talk with Mrs. Losee at that time?  A. Yes, sir.

"Q. And whereabouts did that talk take place?  A. In the Union Station.

"Q. Whereabouts.  A. Denver.

"Q. Tell all that was said between you and she, as far as you can remember.  A. I don't know as I can remember exactly the words; I can the substance.  I asked Frank's condition, and she says he is just like a child, I have to watch him all the time, but I might as well have this money as anyone else.  .  .  ."

The defendant denied making such remarks but she corroborated this witness in part; she admitted meeting and talking with him at the depot in Denver.

A niece of the testator who resided in Denver saw him occasionally while he made his abode with the defendant.   She testified:

"Q. Did you observe him closely then or during any time as to his condition?  Is he of sound or unsound mind?  A. I did.

"Q. What was your opinion?  A. I would not consider him a person of sound mind.

"Q. During the three years you last knew him, would you consider him a person of sound or unsound mind?  A. I would say he was not a person of sound mind.

"Q. You say he was not a person of sound mind.  A. Yes, sir."

Cross Examination.

"Q. Do you mean by that his mind was beclouded by drink?  A. I do not remember whether it was drink or women.  She said 'He cannot leave home, he cannot find the way home.'

"Q. You mean Mrs. Losee said 'He cannot find his way home'?.  A. Yes, sir.

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"Q. The time you last saw Mr. Sharp was here in Denver, Colorado?  A. Yes, sir.

"Q. Did Mrs. Losee object to his staying with you?  A. Yes, sir.

"Q. What did she say?  A. She said he had not been able to find the way home, that she was unable to leave him."

Another witness, who had known Sharp since 1874, testified:

"Q. And were you at Denver, Colorado, at any time after Frank Sharp left here? A. Yes, sir.

"Q. What year was it? A. I was there—let's see, the April before he died.

"Q. Was that the last time you saw him? A. 1917.

"Q. Was that the last time you saw him alive? A. Yes, sir.

"Q. What was the condition of his health? A. Well, it looked bad to me. His legs and feet was swelled up. . . .

"Q. Who was he living with? A. Mrs. Losee. . . .

"Q. . . . The last time you were there you may state how long you were there. A. About an hour.

"Q. During that time, did Mrs. Losee leave the house at any time? A. Yes, she went out just before I left.

"Q. And did you have any talk with Mr. Sharp? A. Yes, sir, he gave me a letter to post.

"Q. Tell the jury how he done that? A. He had a letter wrote and addressed to Alex Haney, and he reached his hand in his pocket and took out the letter and said 'Put that in your pocket and don't let no one see it, and put it in the mail box for me.'

"Q. How did he speak in giving you that direction? A. In a lower tone than he done before. Then I refused.

"Q. Did you mail the letter for him? A. I did, but I made an objection. . . . He said no, Mrs. Losee would catch him, and I told him I would do it myself."

It is unnecessary to reproduce the evidence on this point at greater length. It must be held that it was sufficient to support the judgment that the testator was without testamentary capacity at the time the will was made. (*Howard v. Carter*, 71 Kan. 85, 91, 92, syl. ¶ 6, 80 Pac. 61.)

The findings and judgment that the will was made through the undue influence of the defendant were equally well supported by the evidence. The evidence showed that defendant was well acquainted with Sharp's mental infirmities, that she induced him to turn his property into cash and come and reside with her in Denver, that she induced him to deposit his money in bank to the joint account of himself and defendant, that she engaged and paid the lawyer who wrote the will, and selected the witnesses to the will and one of these testified that he was a total stranger to Sharp, and that he, this witness, did not know it was a will he signed, and two of them testified that Sharp said nothing indicating that he was making or knew he was making a will. During the months just preceding the making of the will, defendant endeavored to prevent the plaintiff from coming to see his father, and dis-

couraged the testator's niece from having him stay or visit at his niece's residence; defendant avowed her purpose to get his property—"that she might as well have it as anyone"; she resisted the doctor's suggestion that Sharp should go to a hospital for treatment; she lived alone with Sharp under circumstances which seemed to violate the proprieties since she was no relation of his except as the forsaken wife of the testator's stepson. These and other significant circumstances tended strongly to support the finding and judgment that the will was not the free and uncoerced act of a normal and rational man of testamentary capacity but was the result of the undue influence of defendant upon the enfeebled and irresponsible mentality of an aged dotard who knew not what he did. (*Hoff v. Hoff,* 106 Kan. 542, 547, 189 Pac. 613.)

The will being void for want of mental capacity on the part of the testator and because of defendant's undue influence (*Hoff v. Hoff,* supra), it is no concern of hers whether the plaintiff, William Sharp, had a valid contract with his father that he should have all the old man's property at the death of the latter or not, nor is it of any further concern to her whether that contract was established by sufficient evidence or not. That might concern his administrator or persons having claims against the elder Sharp's estate. No such claimants are here, and the administrator who was also a defendant has followed out of court all the other defendants who were beneficiaries under the will, and has retired from this lawsuit. But since the will was void, the question whether plaintiff had a valid contract with his father resolves itself virtually into a lawsuit against himself—as plaintiff under his contract, and defendant as sole heir at law and legal successor of the estate. However, we have perused the evidence touching the contract, and we cannot say that it was insufficient to sustain the finding on that point. Such a contract may be proved by parol evidence in this jurisdiction (*Cathcart v. Myers,* 97 Kan. 727, 731, and citations, 156 Pac. 751; *Harris v. Morrison,* 100 Kan. 157, 162, 163 Pac. 1062; *Taylor v. Holyfield,* 104 Kan. 587, 180 Pac. 208), and the plaintiff's testimony touching what his father said to plaintiff's wife in the presence of plaintiff was admissible. (*Page v. Sawyer,* 101 Kan. 612, 168 Pac. 878; *Griffith v. Robertson,* 73 Kan. 666, 85 Pac. 748.)

The foregoing disposes of the principal matters presented in defendant's first brief so far as they can well be discerned from the somewhat haphazard manner of their presentation. We come now to the reply brief and regret to note that it makes a bad start. It commences:

"As to appellee's counter abstract: The instructions, objected to, many of which were surreptitiously slipped to the jury, with the connivance of the court, simply put into the mouths of the jury the desired findings wished by appellee.

"The irregularities of court and counsel for plaintiff in placing instructions in the hands of the jury, surreptitiously, and without submitting them to defendant's attorney for criticisms and objection, is not denied.

"The journal entry is a mass of irrelevant, immaterial, incompetent findings, showing determination on the part of the trial judge to disregard the evidence and find for plaintiff, regardless of the evidence and law."

We must observe that such a tone and statement in a printed brief for this court serves no purpose. The record shows no unseemly conduct on the part of the trial court or counsel. Furthermore, the jury only served in an advisory capacity; it was of no consequence what findings the jury made, unless they were approved by the trial court, and the court was at liberty to adopt those findings or to reject them, or to amplify or modify them according to his discretion. In *Medill v. Snyder*, 61 Kan. 15, 58 Pac. 962, it was said:

"In an action to set aside a will, the court may call a jury to aid it in determining disputed questions of fact, but it is optional with the court whether it will adopt the findings of the jury or ignore them and make findings of its own. When the court gives independent consideration to the evidence and makes its own findings of fact, on which judgment is rendered, errors committed by the jury become immaterial." (Syl. ¶ 3.)

Two sections of the syllabus in *In re Holloway's Estate*, 100 Kan. 368, 164 Pac. 298, read:

"If the case had been tried as though a jury trial could be demanded as a matter of right, and the judgment of the court had been rendered without giving independent consideration to the facts, error in charging the jury might become important; or if the rulings in charging the jury showed that the court had misconceived the law applicable to the case or decided it upon the wrong theory, to the prejudice of a party, error might be predicated on them.

"Upon the record it is found that the court did not treat or dispose of the case as one triable by a jury as a matter of right, but while

Sharp v. Losee.

approving the special findings returned by the jury it made findings of its own on which the judgment was rested." (¶¶ 3, 4.)

Touching the journal entry of judgment it neither discloses the defects urged against it nor does it appear that any motion was made by defendant to correct any defects which may have inhered in it.

It is useless to go over the evidence which tended to show that the testator was not mentally incapacitated from making a will, nor the evidence that tended to show that the will was not procured by the undue influence of the defendant. There was considerable evidence, if the trial court had seen fit to give it credence, that Sharp was not mentally incapable of making a will; and there was evidence, although not very convincing, that the will was not procured to be made through the undue influence of Nettie B. Losee; but the determination of the trial court concludes those questions, and we are bound by them. (*Bruington v. Wagoner,* 100 Kan. 439, 164 Pac. 1057.)

A point is sought to be made that a party is bound by the uncontradicted testimony of his own witnesses. Just what this may refer to is not clear, but the rule has its exceptions. In *Matassarin v. Street Railway Co.,* 100 Kan. 119, 120, 163 Pac. 796, it was said:

"It would be a hard doctrine, indeed, to hold that if every witness produced in support of a cause of action did not give testimony in substantial accord with the evidence of every other such witness, the party producing such witnesses would lose his cause." (p. 120.)

In *Cobe v. Coughlin,* 83 Kan. 522, 112 Pac. 115, it was said:

"A court or jury is not required to believe a witness or accept his statements as conclusive merely because there is no direct evidence contradicting his statements." (Syl. ¶ 2.)

The reply brief continues—

"The finding by the court that 'Frank Sharp had but one living child, a son, William Sharp, plaintiff in this action,' . . . is not proved. . . .

"Will Sharp is not only a 'bastard' but 'he is a dam liar and a thief.' "

While the defendant's answer did deny that the plaintiff was the testator's son, and the evidence which was adduced to show the testator's mental incapacity also showed that when angry, drunk or irrational, the old man applied to plaintiff the epithets above quoted, it does not appear that the question of plaintiff's legitimacy was ever a serious issue in this lawsuit.

This point is an afterthought. In defendant's first brief, she seems to have forgotten that plaintiff's sonship was in dispute. It is there said:

"Upon reaching old age with its infirmities, and no longer being able to work or manage the farm, and always being in disagreement and dispute with his son, Will Sharp, plaintiff, it was only natural that the testator should, sooner or later, dispose of the farm which could be of no further use or enjoyment to him, and find rest and a home with his friend and daughter as he called Nettie B. Losee for many years."

Here and there throughout the record, the plaintiff is spoken of by various witnesses as the son, the only son, of the deceased. One witness, while testifying on other matters, said:

"Q. How long were you acquainted with Frank Sharp? A. I don't know whether we knew him in 1882, but I was acquainted with him in 1883, anyway.

"Q. Where did he live in all these years, up to the time of his death? A. The same place until his death. Not until his death, but until the sale.

"Q. Were you acquainted with Will Sharp? A. I was there when he was born. . . .

"Q. Were you ever over to Sharp's? A. I was there when he was born.

"Q. Did you visit there after that? A. Once or twice a year.

"Q. And did the Sharps ever visit at your home? A. Yes, sir, backwards and forwards."

That a son is born in lawful wedlock may not be conclusive evidence of his paternity (*Hospital Co. v. Hale,* 64 Kan. 367, 67 Pac. 848; *Brooks v. Fellows,* 106 Kan. 102, 104, 186 Pac. 985), but it is evidence of a very potent character. (4 Wigmore on Evidence, § 2527.) This belated point is without merit.

After a patient perusal of this case we discover no error in it, and the judgment is affirmed.