Minch v. Winters.

---

No. 26,818.

BLOOMFIELD H. MINCH et al., *Appellees*, v. HARRY WINTERS et al., *Appellants*.

SYLLABUS BY THE COURT.

1. JOINT ADVENTURE—*Action for Accounting—Relief on Ground of Fraud—Equitable Action—Sufficiency of Evidence—Limitations of Actions.* In an action for an accounting, for relief on the ground of fraud, for an adjudication of the rights and liabilities of the litigants, and to wind up the affairs of a joint adventure in which twenty-two plaintiffs and three defendants had been engaged, the record examined and held (a) that defendants' objection to the introduction of evidence was properly overruled, (b) that the action was one of equitable cognizance, (c) that the demurrer to plaintiffs' evidence was properly overruled, (d) and that the action was not barred by the statute of limitations.

2. PLEADING—*Misjoinder of Parties.* Rule followed that misjoinder of parties is not a ground of demurrer.

3. PLEADING—*Misjoinder of Causes.* Plaintiffs' petition was not subject to demurrer for misjoinder of causes of action; and a demurrer to evidence is not a proper way to raise a question of such misjoinder.

4. TRIAL—*Reception of Evidence—Reopening Case—Discretion of Court.* It it within the sound discretion of the trial court to grant or withhold permission to reopen a case for the introduction of further evidence, and to grant or refuse a continuance; and where the record does not show abuse of such discretion error cannot be predicated on such rulings.

5. CONSPIRACY—*Evidence—Admissibility.* Error based on the admission of hearsay testimony considered and held that the testimony was competent under the rule concerning the admissibility of evidence of the acts and words of one of several conspirators touching a detail of such conspiracy.

6. TRIAL—*Instructions—Advisory Jury.* Error based on instructions to an advisory jury, given and refused, examined and not sustained.

7. JOINT ADVENTURE—*Liability of Parties on Contract—Relief on Ground of Fraud.* Where defendants sought to induce plaintiffs to raise a fund of

Appeal and Error, 4 C. J. p. 660 n. 70. Equity, 21 C. J. pp. 335 n. 81, 425 n. 62, 592 n. 34. Evidence, 22 C. J. p. 396 n. 51. Joint Adventures, 33 C. J. pp. 867 n. 41, 871 n. 21; 15 R. C. L. 507. Pleading, 12 R. C. L. 520, 530. Trial, 38 Cyc. p. 1363 n. 86; 26 R. C. L. 1042.

$300,000 to purchase a number of oil leases, oil wells and equipment, and assured plaintiffs that two of defendants would each put $25,000 in cash into such adventure, and defendants assured plaintiffs that there was no "graft or commission" in the proposition and that all would come into it on an equal basis according to the extent of their several investments, and plaintiffs relying on such inducements and representations raised $220,000, out of which sum the leases and related property were purchased for $160,-000, and defendants and persons associated with them divided among themselves $60,000 of the cash so raised by plaintiffs, a judgment requiring each of defendants to restore the several sums they received out of the $60,000 which belonged in common to those who were participants in the adventure and to perform their respective promises to contribute $25,000 each to such adventure, and for cognate equitable relief, is without prejudicial error.

Appeal from Allen district court; ROBERT E. CULLISON, judge. Opinion filed February 12, 1927. Affirmed.

*F. J. Oyler, W. H. Anderson* and *G. M. Lamer,* all of Iola, for the appellants.

*E. S. McAnany, M. L. Alden, T. M. Van Cleave,* all of Kansas City, *G. R. Gard,* of Iola, *Robert F. Spraggins* and *C. W. Hewgley,* both of Jackson, Tenn., for the appellees.

The opinion of the court was delivered by

DAWSON, J.: This was an action for an accounting, for relief on the ground of fraud, for an adjudication of certain rights and liabilities of the litigants, and to wind up the affairs of a joint adventure in which they were engaged.

Plaintiffs were eighteen citizens of New Jersey, two of Mississippi, and one each of Indiana, New York, and Tennessee; and all of them were alleged to have been the dupes of the two principal defendants, Harry Winters and John Connors, both of Iola, in a speculative venture in Bourbon county oil leases. Roscoe C. Davis, of Bronson, and his brother, Morris Davis, of New Jersey, were involved with Winters and Connors in the matter which gave rise to this lawsuit.

Prior to the autumn of 1920, some of the plaintiffs had been interested as investors in oil-development projects in southeastern Kansas, and the Davis brothers had been intrusted with certain of plaintiffs' business affairs of that character. Some of the plaintiffs had formerly dealt with Winters and Connors in business transactions or speculations.

In the autumn of 1920 one E. J. Miller, an Iola banker, and five associates owned six oil leases covering certain Bourbon county acreage, with some oil wells thereon, and they owned some mis-

cellaneous tools, tanks, pipe and equipment pertaining thereto. These leases, and the related chattel property were being offered for sale for $160,000.

Winters, Connors, and the Davis brothers represented to some of the plaintiffs that these leases and related chattels could be advantageously bought for $300,000, and urged that a syndicate be formed to buy them at that price. They also represented to plaintiffs that they would invest their own money in such a project—Winters to the extent of $25,000, Connors $25,000, Morris Davis $10,000, and Roscoe Davis $5,000.

Acting on this proposal, plaintiffs raised $220,000 in cash, which was intrusted to Morris Davis. He paid $160,000 for the property, and the remaining cash, $60,000, was divided among Winters, Connors, Morris Davis and E. J. Miller.

By common consent Morris Davis took title to the leases and related property in his own name, and he executed certificates to the several plaintiffs showing their respective fractional interests, and also made certificates to Winters, Connors and Roscoe Davis for fractional interests based on their pretended investments therein.

Morris Davis returned to New Jersey and died. It was disclosed that he had brought back from Kansas an unexpectedly large sum of ready cash. E. J. Miller also died, and it was disclosed that he, too, was in possession of an unusually large sum of ready cash. Naturally these disclosures stimulated conjectures as to their possible connection with plaintiffs' investment in the Bourbon county oil leases and eventually precipitated this lawsuit.

The principal matters outlined above were alleged in plaintiffs' petition.

Winters and Connors answered with a general denial and alleged that in the autumn of 1920 they obtained from E. J. Miller a verbal option on the leases and related property for $175,000, and that they had sold the same to Morris Davis for $200,000 upon an understanding with him that each of them was to have and retain a one-twelfth interest in the property, and that each of them did receive $12,500 from Davis pursuant to this transaction, but that Davis was no agent of theirs in any capacity.

The evidence for the litigants was developed at length. That given in plaintiffs' behalf tended to support their cause of action. It showed the raising of $220,000 by plaintiffs and its delivery to

Morris Davis; that Davis was their trusted agent; that he bought the property for $160,000; that out of the $60,000 raised by plaintiffs in excess of the total price paid for the property, Winters and Connors got $12,500 each, E. J. Miller $15,000, and Morris Davis appropriated $20,000 to his own use; that the latter sum was promptly handed over to plaintiffs by the widow of Davis after his death; and the widow of Miller likewise handed over to plaintiffs the $15,000 he had similarly received. The various and sundry fiscal maneuvers of defendants to give ostensible color to their pretended investments of $25,000 each in the $300,000 syndicate were also revealed.

The jury answered certain special questions:

"SPECIAL QUESTIONS SUBMITTED BY THE COURT.

"1. Did Winters and Connors or either of them, during the entire transaction comprising the negotiations for and purchase of the oil and gas properties in controversy, know that Morris Davis was acting as agent for the plaintiffs as well as for himself? A. Yes.

"3. Did defendants Winters and Connors or either of them conspire together to deceive the plaintiffs as to the purchase price the owners of said oil and gas properties demanded for same? A. Yes.

"4. Did said Winters and Connors or either of them, and Morris Davis, conspire with said Morris Davis to deceive the plaintiffs into the belief that said defendants were joining with plaintiffs to purchase the said oil and gas properties and were paying for the shares of same which they were to receive? A. Yes.

"6. Were the plaintiffs, as a result of any conspiracy between the defendants Winters and Connors and Morris Davis, or by any false statements of said defendants Winters and Connors as to the actual purchase price of said properties, or as to whether said Winters and Connors were becoming buyers with plaintiffs and paying for whatever shares they were to receive, if such statements were made, deceived into the belief that the purchase price of said properties was greater than it actually was, and into the belief that said Winters and Connors were buyers with them of said property and not sellers of the same either personally or as agents for some other persons, and that said Winters and Connors were actually paying for the shares of said property they were to receive? A. Yes.

"SPECIAL QUESTIONS SUBMITTED BY THE PLAINTIFFS.

"3. Did Winters and Connors or either of them in the presence of the other tell the people from Mississippi, Bridgeton and Kokomo [some of plaintiffs] that the leases could be bought for $300,000, and that that was a reasonable price for them? A. Yes.

"4. Did Winters and Connors or either of them in the presence of the other tell the Mississippi, Bridgeton and Kokomo people named in question 2, that

they intended each to take a 1/12 interest in the leases if purchased, and to pay $25,000 cash therefor?  A. Yes.

"5. Did Winters and Connors or either in the presence of the other tell the parties named in question 2, that no one was getting any commission, rake-off, or bonus, on the purchase of the leases if made, but that all those acquiring an interest were to come in on the same basis?  A. Yes.

"8. Were the plaintiffs named in question 7, induced, in any degree, by the statements made by Winters and Connors, if you find they were made them, to the effect that each would pay $25,000 for a 1/12 interest in the leases, and that neither themselves nor anyone else was getting a commission, bonus, or rake-off, on the sale, and that all purchasers were coming in on the same basis to make the investment each afterwards made in said leases?  A. Yes.

"SPECIAL QUESTIONS REQUESTED BY DEFENDANTS.

"1. Did the defendant, Harry Winters, have a verbal option from E. J. Miller on the oil and gas leases, property and equipment in Bourbon county, Kansas, described in plaintiffs' petition for himself and John Connors for $175,000, prior to the consummation of the sale of the same to Morris Davis?  A. Yes.

"6. Did either of the defendants have anything to do with the making of said assignments by Miller and associates to Morris Davis?  A. No.

"8. Was Morris Davis at any time acting as agent of either of the defendants?  A. We think they were copartners in this transaction.

"14. Is it not a fact that plaintiff, R. M. More, had notice and knowledge that defendants' price for said leases was $200,000 cash and they to retain a 1/12 interest each therein?  A. No, we believe he knew the 1/12 interest was to be in the $300,000 price.

"15. Is it not a fact that plaintiff, R. M. More, had notice and knowledge that E. J. Miller gave Morris Davis a fictitious and fraudulent option for $300,000, to take back to show the proposed purchasers, the plaintiffs in this suit?  A. Yes."

Defendants moved to set aside certain of these special findings; the trial court took the whole cause under advisement, and made certain findings of fact and conclusions of law, and gave judgment for plaintiffs.  That judgment determined the respective interests of all the litigants, required Winters and Connors to return the $25,000 which they had received out of the money raised by plaintiffs to buy the leases, and required them to pay into the syndicate the $25,000 each in accordance with their avowed promises and pretenses by which the plaintiffs were induced to contribute their respective shares in this ill-starred adventure.  Other details of the judgment need not be stated; a receiver was appointed and the affairs of the joint adventure were wound up except so far as they

await the result of this appeal. There was no motion for a new trial.

Defendants Winters and Connors assign and urge certain errors:

1. They first urge that the court erred in overruling defendants' objection to the introduction of evidence. In support of this contention defendants say:

"A careful reading of the petition will disclose that it was one for damages, a suit at law, not one in equity and not a suit for an accounting, and we contend and did contend all of the way through the trial of the cause that it was one sounding in tort, one for fraud, and that a general verdict should have been submitted to the jury and it should have been tried as a suit at law and a general verdict to the jury for its determination."

We cannot agree to this contention, and, if we did, that would not be a good reason why the trial court should sustain an objection to the introduction of evidence. We do not discover in the petition itself such infirmities as would prevent a court from trying the cause on the issues framed by the pleadings. Another objection to the introduction of evidence set down in defendants' brief reads:

"Defendants objected further to the introduction of evidence over the petition for the petition plainly shows a misjoinder of causes of action and a misjoinder of parties plaintiff. The petition showed upon its face that the plaintiffs were not affected alike; that their interests were not alike; that judgment in their favor could not be rendered against defendants for the total sum sued for by either of the plaintiffs, for that some of the plaintiffs had a $\frac{3}{60}$ interest in the result of the suit; others had a $\frac{2}{60}$ interest; others a $\frac{4}{60}$ interest, another a $\frac{1}{24}$ interest and one a $\frac{1}{40}$ interest."

This analysis of the nature of the action makes a very good argument that the cause was one of equitable cognizance and not an action at law. And although the trial court was at first inclined to treat the case as a law action, it properly changed its attitude thereto as the trial disclosed its complicated aspects. Indeed in this case there was such a tangle of interests that an action of an equitable nature alone could adequately relieve and adequately redress the grievance of which the plaintiffs complained. (*Fisher v. Rakestraw et al.*, 117 Kan. 441, 232 Pac. 605, and citations; *Spena v. Goffe*, 119 Kan. 831, 241 Pac. 257.) Defendants cite *Dunn v. Mortgage Co.*, 113 Kan. 169, 213 Pac. 655, but that case, in our opinion, presents no particular analogy to the case at bar. Here there was no series of independent transactions between the individual plaintiffs and defendants. The relationship of the parties grew out of one transaction, and it would necessarily result in a

Minch v. Winters.

multiplicity of actions if the right to maintain a suit of an equitable nature were denied. Indeed, if held down to such technicality of procedure, each plaintiff would have been compelled to bring two actions: *first,* one for discovery, since the full extent of defendants' alleged duplicity could not have been ascertained without the aid of the powers of a court of equity; and, *second,* an action for damages for the wrong suffered or for equitable redress as the facts and circumstances might suggest and require. It should not be forgotten that in the simplification of our civil code and the statutory abolition of distinctions between actions at law and suits in equity (R. S. 60-201), the legislature was not engaged in curtailing the essential powers of our courts of general jurisdiction. The legislative purpose was rather to emancipate the courts from those ancient artificialities of procedure which handicapped them in dealing out whatever measure of redress, legal or equitable, justice in any case required. (*Houston v. Goemann,* 99 Kan. 438, 162 Pac. 271, and citations; *Kolbourn v. Sunderland,* 130 U. S. 505; and Rose's notes thereto in 32 L. Ed. appendix.)

2. Defendants' next point is that their demurrer to plaintiffs' evidence should have been sustained. Under this heading, it is argued that plaintiffs' cause of action was not established by the evidence. We have read and considered this record, but discover no shortage of evidence to establish it. On the contrary, plaintiffs' evidence to which the trial court gave credence justified that court's characterization of it, thus:

"The evidence presents about as sordid a spectacle of deceit, treachery, betrayal of confidence and corruption as can well be imagined. The evidence is so overwhelming that no self-respecting jury could have made answers other than those they did. As a matter of conscience and good morals, it is unquestioned that the plaintiffs have been wronged and are entitled to redress from the defendants. If there is anything standing in the way of the recovery of plaintiffs, it would be a mere technicality without the support of right, conscience, good morals, or sound reason. The court knows of no technicality that ought to prevent the recovery of plaintiffs."

In this connection, it is also argued that the cause of action was barred by the two-years provision of the statute of limitations. How so? The transaction whereby plaintiffs were induced to embark on this adventure occurred in the autumn of 1920; the duplicity of defendants was not revealed until long afterwards; and indeed it took this action itself fully to discover the facts upon which the action

was founded, and this action was begun in October, 1922. Moreover, even if this point had merit, defendants' pleadings do not disclose that it was fairly raised.

Another point raised by defendants under their demurrer to the evidence was that "two or more plaintiffs are improperly joined." Misjoinder of parties would not support a demurrer to the evidence, and is not now demurrable at any stage of a lawsuit. (R. S. 60-601; 60-705; *Winfield Town Co. v. Maris,* 11 Kan. 128, 147; *Blodgett v. Yocum,* 80 Kan. 644, 649, 103 Pac. 128; *Yount v. Hoover,* 95 Kan. 752, 755, 140 Pac. 408.)

Yet another point is urged in support of defendants' demurrer to the evidence—misjoinder of causes of action. In this connection it is asserted that such misjoinder was disclosed on the face of the petition. This court does not discern any such defect, and if it were apparent, it ought to have been raised by demurrer to the petition or by answer. (R. S. 60-705, 60-707; *Hurd v. Simpson,* 47 Kan. 372, 27 Pac. 961.) This was not done. Furthermore, if any one of plaintiffs by act, fault, aider or acquiescence had given countenance to the actionable delinquency of defendants, that would not disclose misjoinder of parties nor of causes of action. Once a court acquires jurisdiction of a cause and of the parties, and especially a court exercising its inherent or vested jurisdiction in equity, it is not very important whether all the parties are formally ranged on one side or the other as plaintiffs or defendants. If they should join as plaintiffs but decline to do so, they may be made defendants, if their appearance in the action is necessary. (R. S. 60-410 to 60-413.) However the litigants or any of them choose to appear, or are caused to appear, individually or collectively, the court has ample authority to give to each litigant his due measure of justice; and no misjoinder of causes of action necessarily exists because perchance the measure of justice dealt out to each litigant may differ in kind and degree from that awarded to or imposed on every other litigant concerned.

Error is assigned in permitting plaintiffs to reopen their case to introduce evidence on the question of an accounting. Obviously that was a matter within the sound discretion of the trial court. (*Heck v. Quindaro Township,* 113 Kan. 647, 216 Pac. 293.) This record does not disclose any abuse of that discretion.

Two errors are based on the trial court's ruling that the action was

one of equitable cognizance and not one on which defendants had a right to invoke the general verdict of a jury. These features of this appeal have been sufficiently considered in this opinion.

Error is urged in the trial court's denial of defendants' request for a continuance after the court had decided that the action was for an accounting and equitable relief, and not one merely for damages. The record shows the colloquy of court and counsel on this point. The court repeatedly ruled that defendants would be given plenty of time to meet the issues, and to secure attendance of witnesses. The court said:

"Well, we will take all summer, if it is necessary to do so, to try this case right. It is a rather complicated case, but I am going to try it right as I view the matter."

Defendants did not follow the proper practice to obtain a continuance as prescribed by the code (R. S. 60-2934); the motion or request was not backed by a pertinent affidavit; and the error complained of cannot be sustained. (*State v. Giles,* 119 Kan. 417, 239 Pac. 756. See *State v. Ball,* 110 Kan. 428, 432, 204 Pac. 701; *Leach v. Urschel,* 112 Kan. 629, 635, 212 Pac. 111.)

The seventh error urged against this judgment relates to the admission of incompetent or hearsay evidence. Over defendants' objection a witness, Charles, was permitted to testify that he had heard Morris Davis say that the price of the leases was $300,000. Since a matter of prime importance in this action was the alleged conspiracy of Winters, Connors and the Davis brothers, that was competent evidence and tended to prove such conspiracy. A statement made by one of them concerning the transaction was competent evidence against all engaged in that conspiracy. That rule prevails even in criminal cases (*State v. Mullins,* 95 Kan. 280, 291-295, 147 Pac. 828; *State v. Shaw,* 108 Kan. 781, 783, 196 Pac. 1100) and its pertinency is quite as obvious in civil proceedings. (22 C. J. 396.)

The eighth error assigned pertains to the exclusion of evidence, but what its nature, quality and probative worth may have been the record does not disclose. (*Leach v. Urschel,* supra.)

The ninth error is based upon the trial court's refusal to give certain instructions requested by defendants. Those have been examined. They embodied defendants' theory of this case—an altogether erroneous one, as we have already pointed out, and the

instructions were properly refused. Moreover, this jury served only in an advisory capacity; and the court made its own findings under the same evidence, so the refusal of the requested instructions manifestly could not amount to prejudicial error. (*Munn v. Gordon,* 87 Kan. 519, 125 Pac. 7.)

Error is also assigned on the instructions given. Defendants' criticisms thereon have been considered. They lack merit, and the error assigned is not sustained.

Fault is found with the jury's answers to some of the questions, but being advisory, and corrected and improved in text and precision by the court's own summary of the findings, the jury's answers to the special questions were not of controlling significance.

In *Martin v. Ott,* 114 Kan. 419, 422, 219 Pac. 275, it was said:

"Since the jury only served in an advisory capacity, the court's refusal to submit them could not possibly be error, as no controlling significance would necessarily attach to the jury's findings even if the questions had been submitted and answered favorably to plaintiff. (*Sharp v. Losee,* 109 Kan. 211, 220, 199 Pac. 94; *Kuhn v. Kuhn,* 112 Kan. 155, 160, 210 Pac. 343.)"

In *Bell v. Skinner,* 119 Kan. 286, 290, 239 Pac. 965, it was said:

"Appellants . . . seem to overlook the fact that this was a case of an equitable character, where, if a jury is called at all, it serves only in an advisory capacity, and the court is not bound to defer to its judgment, and, indeed, in such cases the trial court cannot shift its own peculiar responsibility for the discovery of the truth of disputed facts by merely calling an advisory jury to its assistance."

These excerpts from decided cases dispose of this particular complaint, and likewise furnish a complete answer to the error based on the trial court's refusal to set aside certain of the jury's special findings.

The 15th, 16th and 17th errors pertain to the trial court's findings and judgment entered against defendants. It is useless to amplify this already too lengthy opinion with a disquisition on this point. We think the findings were well supported by the evidence and the judgment was eminently equitable and just. Winters has $12,500 in his pocket which plaintiffs put into the fund to buy these leases. Connors ditto. Connors assured one of the plaintiffs: "Before God, Jim, there was not one penny of graft or commission in this transaction to my knowledge." Now they must pay that money back. (*Withroder v. Elmore,* 106 Kan. 300, 187 Pac. 863.) Winters promised to put up $25,000 of his own money to make up a $300,000

fund to buy these leases. Connors ditto. Now, having induced plaintiffs to put their money into this project on their faith that Winters and Connors were doing likewise, and on the faith that a $300,000 fund was being raised for this common adventure, Winters and Connors must do as they promised. Defendants here and there throughout this appeal inveigh against one of the plaintiffs, Richard M. More. We do not quite understand why. The trial court found that he was one of the plaintiffs who was defrauded by defendants. There was evidence to support that finding and that should settle it; but even if More were knowingly a participant in defendants' duplicity, that fact would not relieve them by one jot or tittle of their liability to disgorge the moneys they hold which were contributed for the success of this adventure, nor relieve them of their duty to pay over their promised subscriptions of $25,000 each, on reliance of which so many of these innocent plaintiffs contributed their cash to this project. Moreover, it is useless to reargue the probative force of the evidence. Of course defendants had a right to take an option on this property for $175,000 and sell it to plaintiffs for $300,000 and pocket the net profit. But the evidence which the tribunal charged with the ascertainment of the facts chose to believe was that no such deal transpired, but one vastly different therefrom, and which was in substantial accord with the facts alleged in plaintiffs' cause of action. (*Agricultural Ins. Co. v. Ætna Ins. Co.,* 119 Kan. 452, 457-459, 239 Pac. 974.)

In a reply brief of appellants it is contended that the trial court made no special findings of fact independent of those of the jury. We consider the memorandum accompanying the court's decree to be the trial court's conclusions of fact separate from its conclusions of law, as permitted and sometimes required by the code. (R. S. 60-2921; *Alexa v. Alexa,* 108 Kan. 38, 193 Pac. 1083.) But be that as it may, appellants' reply brief assures us that the trial court adopted as its own the special findings of the jury. Such adoption rendered them the court's own conclusions of facts, which gave them the requisite potency on which to base the judgment.

Other matters urged against the judgment have not been overlooked, but we discern nothing further which would justify discussion. Nothing approaching the gravity of prejudicial error is apparent in the record. The judgment is therefore affirmed.