ABNEY *v*. LEWIS.

Division A.   Jan. 14, 1952.

No. 38173 (56 So. (2d) 48)

**Beard, Pack & Ratcliff**, for appellant.

**Deavours & Hilbun,** and **Buchanan & Montgomery,** for appellee.

**Kyle, J.**

Mrs. Mamie Morrison Abney, complainant, filed her bill of complaint in the chancery court of the First Judicial District of Jasper County against Talmadge D. Lewis, defendant, asking for a cancellation of the defendant's claim to oil royalties on a 20-acre parcel of land conveyed by the complainant to the defendant on October 12, 1942, and for a reformation of the deed of conveyance and a restraining order restraining the defendant from claiming any right or interest in an oil, gas and mineral lease, which had been executed by the complainant to J. S. Wheeless, Jr. on October 19, 1939. After a hearing of the cause upon the pleadings and proof, the chancellor entered a decree dismissing the bill with prejudice, and from that decree the complainant prosecutes this appeal.

The deed of conveyance executed by the complainant to the defendant contained the following reservation, which constitutes the basis of the controversy involved in this suit, to wit: "The above land is sold subject to an oil, gas and mineral lease executed by the grantor on the 19th day of October, A.D. 1939, to J. S. Wheeless, Jr., of Jackson, Mississippi, and all rentals under said lease are hereby reserved and are to be paid to the grantor herein."

The record shows that Mrs. Abney, who was the owner of the 20-acre tract of land at that time, rented the land to Lewis for the year 1938 for agricultural purposes for the sum of $20, and that Lewis thereafter continued to occupy and cultivate the land as Mrs. Abney's tenant until the date of the execution of the above mentioned deed, paying to Mrs. Abney an annual rental of $20. On October 19, 1939, Mrs. Abney executed the above mentioned oil, gas and mineral lease on said land to J. S.

Wheeless, Jr. The lease was for a primary term of ten years and was to continue thereafter as long as oil, gas or other minerals were produced. The lease recited a cash consideration of $10, and the lease provided for the payment of annual delay rentals of $1 per acre if drilling operations were not begun within one year; and the lease provided for the payment of the usual one-eighth royalty on all oil and gas produced on said land and a one-tenth royalty on all other minerals mined and marketed. Robert T. Morrison, Mrs. Abney's brother, was in charge of the land as Mrs. Abney's agent at the time of the execution of the mineral lease and at the time of the sale of the land by Mrs. Abney to Lewis, and Morrison collected the rents for Mrs. Abney and represented Mrs. Abney in the negotiations with Lewis for the sale of the land to Lewis.

The chancellor, after hearing the testimony of the witnesses, made a detailed finding of facts, which has been made a part of the record on this appeal, and those facts are substantially as follows: Lewis came into Morrison's store in the City of Laurel in the fall of 1942 and told Morrison that he decided to purchase the land for the sum of $5 per acre, which was the price for which Morrison had proposed to sell the land to Lewis. Morrison told Lewis that his sister had executed an oil, gas and mineral lease on the land and that she wanted to reserve all the rights under the lease, and this statement was repeated to Lewis three or four times. Lewis objected to anyone going on the land should he buy it and ruining it for agricultural purposes. Morrison advised Lewis that under the lease the lessee could go on the land at any time; but Lewis objected, and so far as the record shows that objection was never retracted. The chancellor found that Lewis told Morrison that Mrs. Abney could retain the annual rental to become due under the lease; and the chancellor found that Morrison, acting for Mrs. Abney, agreed that Lewis might purchase the land for the sum of $100. Morrison told Lewis that

Mrs. Abney was in the City of Washington, and that he would have the deed prepared and sent to her for proper execution by her, and that he should have it back within a week. Lewis stated that he would return in about a week and get the deed. Morrison went to Colonel C. R. Shannon, his attorney, in the City of Laurel, and employed him to prepare the deed. Morrison advised Colonel Shannon that Mrs. Abney wanted to retain all rights under the lease. Colonel Shannon prepared the deed, which contained the above mentioned clause reserving to the grantor all rentals under the lease. Morrison mailed the deed to Mrs. Abney, who at that time was in Washington, and Mrs. Abney executed the deed and returned it to Morrison immediately. Lewis came into the store again a few days later, and after Morrison had read the deed to Lewis, Lewis gave Morrison a check for the $100 and Morrison delivered the deed to him.

Oil was discovered in the Heidelberg area about a year later, and soon thereafter a producing well was completed on a tract of land immediately adjoining the above mentioned 20-acre tract.

The chancellor, in his opinion, after stating the facts, as set forth above, said: "The land was conveyed subject to an oil, gas and mineral lease, as many, many deeds are now executed. There is no difficulty in the construction of that part of the paragraph. The question arises in the last clause, which reads: 'All rentals under said lease are hereby reserved and are to be paid to the grantor herein.' I am of the opinion that the term, 'all rentals,' does not include royalties for two reasons: (1) It is the law in the State of Mississippi that minerals are owned in place, and (2) the clause is 'all rentals under said lease.' What lease? The lease as described in the first part of the sentence, that is, the lease executed by the grantor on the 19th day of October, 1939, to J. S. Wheeless, Jr., of Jackson, Mississippi. So then we turn to the lease to see what rentals are under the said lease. The lease itself designates what rentals are, namely, the

annual delay rentals of $20, or $1 per acre, which under the terms of the lease is called a rental. The lease does not designate royalties as a rental. The deed by reference incorporates the lease in the deed.''

The chancellor then discussed briefly the testimony upon which the complainant based her claim for reformation of the deed, and the chancellor held that the complainant had failed to prove by clear and convincing evidence that there had been a mutual mistake in the preparation of the deed and that she was entitled to a decree of reformation. The chancellor denied the relief prayed for and entered a decree dismissing the bill of complaint with prejudice.

We have carefully examined the testimony of the witnesses, and we have carefully read the briefs filed by counsel for both parties; and in our opinion the decision of the chancellor on both of the issues presented is correct and must be affirmed.

The terms of the oil, gas and mineral lease referred to in the deed are clear and unambiguous. The rentals to be paid to the lessor and the royalties retained by the lessor are treated as separate and distinct items. The lease was for a primary term of ten years, and as long thereafter as oil, gas and other minerals were produced on the land. Drilling operations were to be commenced within one year from the date of the lease, and unless such drilling operations were commenced within one year the lessee agreed to pay the the lessor the sum of $20, called ''rental'', ''which shall cover the privilege of deferring operations for a period of 12 months;'' and in like manner and upon like payments the commencement of drilling operations might be deferred for successive periods of 12 months during the primary term. The payment of the ''rental'' might be made by check or draft of the lessee mailed or delivered to the lessor, or to a bank designated to receive the same. The lessee had a right at any time to release and surrender any part of the acreage described in the lease, and thereafter the

"rentals" should be reduced in the proportion that the acreage covered by the lease was reduced by such release. If a part of the acreage covered by the lease should be involved in a pool with other acreage of adjoining lands (as authorized by the lease), the lease might be maintained as to the remaining acreage by paying "rentals" in proportion to the acreage excluded from the pool. And in the event the lessor should assign the lease as to a segregated portion of the land, the "rentals" should be apportioned among the leaseholders ratably according to the surface area owned by each.

The "royalties" to be paid by the lessee under the terms of the lease were: (a) on oil, 1/8th of that produced; (b) on gas, including casinghead gas or other gaseous substance, the market value at the well of a 1/8th part thereof; and (c) on all other minerals mined and marketed, a 1/10th part thereof in kind or value at the well or mine. The lessee was given the right under certain conditions to pool the acreage covered by the lease with other adjoining land, and in that event, in lieu of the "royalties" provided for in the lease elsewhere, the lessor should receive only her proportionate part of the "royalties" to be paid for the total acreage in the particular unit involved in the pool. And lastly, in the event of failure of title as to any part of the land, or any interest attempted to be conveyed, the "royalties" and "rentals" to be paid to the lessor should be reduced proportionately.

In the case of Palmer v. Crews, 203 Miss. 806, 35 So. (2d) 430, 4 A. L. R. (2d) 483, this Court held that a "royalty", as that word is used in an oil, gas and mineral lease contract, is an interest in real estate, entitling the royalty owner to share in the production of oil, gas and other minerals therefrom. And in the case of Anderson v. Butler, 203 Miss. 512, 35 So. (2d) 709, this Court held that the parties may make such contract as they wish as to the division of rentals and royalties, thus recognizing that there is a difference in the meaning of the two words.

In the case of Armstrong v. Bell, 199 Miss. 29, 24 So. (2d) 10, 12, this Court in construing a mineral reservation clause in a deed, said: ''The record discloses that about two months prior to the execution of the deed in the case at bar, the grantor executed an oil, gas and mineral lease in favor of one Stokes, mentioned in the reservation here under consideration, from which he was to receive annual rentals of $850 and as a further consideration was to have and receive 1/8th of any oil, gas and other minerals that may be produced from the land. This outstanding lease was to run for a period of ten years. It was recorded on the next day following the execution of the deed of conveyance here involved, and was not relinquished and cancelled until the following year. Therefore, there was left to the grantor Bell only the fee simple title to the soil, the right to receive the rentals and the 1/8th royalty if production was had under the lease, and the reversionary interest in the minerals in place if the lease expired by its terms or was permitted to lapse.''

In the case of Miller v. Carr, 137 Fla. 114, 188 So. 103, the Court said that ██ █ ''rent'' is the term applied to the privilege given to bore for gas and oil for delay in beginning operations, while ''royalty'' is a certain percentage of oil after it is found, or so much per gas well developed.

We must construe the reservation in the deed that we now have before us as it is written.

The term ''rentals'' as used in the reservation related to rentals reserved in a specific lease which the parties had before them at the time the deed was prepared. And we think that the chancellor was correct in holding that the ''rentals'' reserved were the delay rentals which the lease provided that the lessee should pay for the privilege of delaying drilling operations, and that the term ''rentals'' as used in the reservation did not include ''royalties.''

The attorneys for the appellant, however, insist that Mrs. Abney was entitled to have the deed reformed on the ground that there had been a mutual mistake in the preparation of the deed which failed to contain a proper reservation to the grantor of the royalties payable to the lessor under the terms of the lease. But, as stated above, we think that the chancellor was justified in holding that the appellant failed to prove by clear and convincing evidence that there was a mutual mistake. While it is true that Robert T. Morrison testified that he expressly stipulated that Mrs. Abney was to reserve "all rights under the lease," Lewis testified that Morrison said that Mrs. Abney wanted to reserve the $20 delay rentals and that he consented to that only, and that the matter of the royalties was never mentioned. The deed was prepared by the attorney selected by Mrs. Abney and her agent, Robert T. Morrison, and under Morrison's instructions. The attorney, at the time he prepared the deed, had before him the lease which is expressly referred to in the deed. Mrs. Abney testified that she read the deed before executing the same and returning it to her brother for delivery to the purchaser. Morrison stated that he read the deed to Lewis before the delivery of the deed. Under these circumstances we do not think that the chancellor could have held otherwise than as he did hold on the question as to the complainant's right to a reformation on the ground of mutual mistake in the preparation of the deed.

In the case of Allison v. Allison, 203 Miss. 15, 33 So. (2d) 289, 290, the Court held in conformity with the rule laid down in many earlier cases that, in the absence of fraud or inequitable conduct of one of the parties, the mistake, to justify a reformation of an instrument, must be a mutual mistake; and the Court also held that in order to warrant reformation of a deed on the ground of mutual mistake, the evidence must be clear and convincing. In that case the Court said, in part: "The bill is grounded alone on mistake. It repeatedly disclaims

any intimation that Mr. Allison was guilty of any wrong or fraud. The chancellor found there was no mistake—certainly no mutual mistake—and refused to reform the deed. He was amply justified in doing that. * * The chancellor would have been well warranted in finding that no mistake at all was made, but he certainly was amply justified in finding that there was no mutual mistake. To warrant the reformation of a deed on the ground of mutual mistake the evidence must be clear and convincing. Jones v. Jones, 88 Miss. 784, 41 So. 373; Lamar v. Lane, 170 Miss. 260, 154 So. 709; Seymour v. Lamb, 185 Miss. 37, 185 So. 824. In the absence of fraud, or inequitable conduct of one of the parties, the mistake, to justify a reformation of an instrument, must be a mutual mistake. 45 Am. Jur., 606, Sec. 46; Whitney Central National Bank v. First National Bank, 158 Miss. 93, 130 So. 99; Wall v. Wall, 177 Miss. 743, 171 So. 675. As stated, the bill disclaims any intimation Mr. Allison was guilty of any wrong. No mutual mistake is shown.''

There was no evidence of fraud or inequitable conduct in the procurement of the deed in the case that we now have before us, and the evidence of mutual mistake offered by the complainant was insufficient to justify the Court in granting a reformation.

The decree of the lower court is therefore affirmed.

Affirmed.