No. 29,879.

Mary S. Warner, *Appellee*, v. The Shell Petroleum Corporation
et al., *Appellants*.

(297 Pac. 682.)

Opinion filed
April 11, 1931.

*Albert Faulconer, Kirke W. Dale, C. L. Swarts,* all of Arkansas City, *W. T.
McBride, John A. Potucek,* both of Wellington, *Guy A. Thompson, Samuel A.
Mitchell, Frank A. Thompson, Truman Post Young* and *W. K. Koerner,* all
of St. Louis, Mo., for the appellants.

*W. L. Cunningham, William E. Cunningham, D. Arthur Walker, Fred G.
Leach,* all of Arkansas City, and *W. J. King,* of Geuda Springs, for the appellee.

The opinion of the court was delivered by

Johnston, C. J.: This action was brought to recover damages
for the injury and practical destruction of a producing oil well.
Plaintiff recovered a judgment for $5,097.49, and the defendant
appeals.

The plaintiff, Mary S. Warner, owned a tract of land in Sumner
county upon which she executed an oil and gas lease to a lessee,

which passed by assignment to defendant, the Shell Petroleum Corporation. The defendant entered into a contract with Harris & Hahn, a corporation, to drill a well on the tract for oil and gas. The latter drilled a well to the Wilcox sand, a depth of 3,791 feet. The top of the oil sand was reached on June 3, 1928, whereupon the well was turned over to the defendant, as the contract provided for a thirty-day test as to whether it was a commercial well. Then the defendant took charge of and operated the well until November 11, 1928. To that end it employed the drillers who had sunk the well for Harris & Hahn. At the first, oil flowed at an estimated rate of 250 to 300 barrels per day, but about thirty days after the defendant took charge of the well, the production ran down to about 60 barrels per day, but the operation was still continued. Later the quantity of oil decreased and the flow of salt water increased. On November 11, 1928, the derrick at the well burned, and then the defendant abandoned the well and later pulled the casing.

The plaintiff alleged that when the defendant took over the well it became its duty to prudently operate the same and protect it from salt water from the strata above the oil sand, and not to permit disintegrated shale, falling from the walls of the hole, to accumulate in the bottom of the oil sand, and that there was about 40 feet of shale formation above the oil sand, which was not protected by casing; that the shale was allowed to disintegrate and fall into the well, and not being cleaned out, formed a putty-like substance which tended to seal up the well and obstruct the flow of oil. Instead of cleaning it out, the defendant used a swab therein which drove the accumulation of shale back into the oil sand so that the salt water from the strata above flowed into the well in large quantities, by reason of which the oil was driven back from the well, and tended to permanently seal it. It is further alleged that the defendant carelessly, negligently and unskillfully removed the casing in the well above the strata of salt water, so that the salt water flowed into the oil sand in large quantities, and by reason of which the oil was forced and driven back from the well. Further, it was alleged that in pulling the casing from the well defendant used large and excessive quantities of high explosives which caused parts of the casing to collapse and the walls of the well to cave in, thus permitting large quantities of salt water to pass into the oil sand and destroy its usefulness.

It is further alleged that the swabbing of the well was itself a negligent and improper operation, as it was done without cleaning out the well and had forced large quantities of mud and slush into the bottom of the well, and which operated, too, to shut off the oil, so that oil could not flow into the well. Much testimony in support of the allegations was produced, and to special interrogatories submitted to the jury the following answers were returned:

"1. What interest did plaintiff have in the oil rights in said land at the time complained of in said petition? A. One-eighth oil interest.

"2. Was the defendant Shell Petroleum Corporation guilty of any negligence in any of its acts? A. Yes.

"3. If you answer the preceding question in the affirmative, then state specifically of what the negligence consisted. A. Set casing. Not drilling in. Improper plugging.

"4. If you answer the preceding question in the affirmative, was the plaintiff damaged thereby? If so, in what respect? A. Yes. Improper set of casing. Damage to oil sand.

"5. If in answering the questions 2, 3 and 4 you find the defendant guilty of negligence and the plaintiff damaged thereby, then state specifically how each act of negligence operated so as to produce said damage to plaintiff. A. Let water into sand and caused damage to oil strata.

"6. If you find for plaintiff and return a verdict in her favor, then state the items of damage you find, and the amount awarded for each item. A. Assuming a 25-barrel well for 21 months at $1.33 per barrel, equals $2,597.49, damage for life of well. Damage to oil strata, $2,500."

A large volume of testimony was taken which was preserved in an abstract of 205 pages. There is evidence tending to show that when defendant took over the well the casing had not been extended to the oil sand as it should have been, but that about 40 feet of the bottom of the well drilled through soft shale was not cased. Salt water had been encountered at several levels during the drilling of the well and back of the casing which extended down about 3,744 feet, there was a large quantity of water. Witness testified that the proper way to handle the well under the circumstances was to set the casing down upon the oil sand and then cement it in order to shut off the intrusion of the water, and that if this had been done it would have excluded the water from the oil sand. It was not done, and Stearns, who was in charge of the work for the defendant, said that the reason it was not done was that he was not given authority to do so. The defendant began operations by swabbing the well and continued it for about seventy days. There was testimony that this process operated first to pull the gas out of the sand. The gas, it was

said, is the propulsive force of nature which extracts the oil out of the sand more thoroughly than it can be taken out in any other way. The suction of the swabbing process drew the water in from outside the casing and from the soft shale at the bottom of the well that was not cased. The testimony was to the effect that such a process was not used where the casing is 40 feet above the oil sand, and that it had a tendency to pull the salt water into the well and injure it. As the swabbing continued the flow of salt water increased and the oil production decreased. An off-set well, known as the Hendryx well, near the well in question was drilled down to the Wilcox sand about the same depth as the well in question, but it was operated in a different way and produced oil in paying quantities and, it appears, was producing about fifty barrels a day at the time of the trial. There was no material variance in the formations in the two wells, but in the Hendryx well the casing was set down on the oil sand and the swabbing process was not used in operating it. The value of the production of that well appears to have amounted to about $35,000. There was testimony to show that the Warner well was improperly plugged, and also that in removing the casing which, it appears, did not belong to defendant, it used a blasting process with nitroglycerine which caused the collapse of the casing and had a tendency to open up fissures in the ground outside of the pipe and let salt water that was behind the pipe flow into the well. A reading of the evidence convinces us that the defendant was shown to be negligent in failing to case the well down to the oil sand and to properly cement it, also in excessive swabbing through 40 feet of disintegrating shale at the bottom of the well instead of placing it on a pump shown to be the proper method and the one usually employed in such a well, and further in using high explosives in taking the casing out of the well, which allowed the salt water to flow in and to permanently destroy the well.

There is, we think, sufficient evidence to support the findings of the jury which have been approved by the trial court.

The contention that the allegations of the petition were not broad enough to warrant the admission of evidence and justify the findings made as to the defendant's negligence in the several particulars mentioned is deemed to be without merit.

Complaint is made of the instructions given by the court, first

as to the statement of the issues in the case, including the failure to case the well down to the oil sand and the protection of it. It is claimed that the allegations of the petition do not justify this charge. As already stated the statement appears to have been covered by the allegations of the petition and the evidence produced during the trial.

Another instruction is challenged in which the court, after placing the burden of proof upon the plaintiff, advised the jury that:

"It is admitted by both plaintiff and defendant that at the time the oil was first discovered it was a producing well of several hundred barrels per day. So the first principal question for you to determine is: Was the well so negligently handled by the defendant as to damage it as a producing oil well, and, if so, to what extent? And, further, was it so managed carelessly and negligently while a producing well and at the time the casing was pulled and the same plugged so as to permit salt water to flow into the oil-bearing sand on plaintiff's premises?"

It is argued that this instruction is too general and did not limit the jury to the issues of negligence made by the pleadings. It may be said that the court had in an earlier instruction defined the issues as set forth by the plaintiff and this instruction is a summary of the claims of plaintiff as set forth in a prior instruction and is not open to the objection made.

Still another instruction, number eight, is criticized, wherein it provides that:

"If you should find from the evidence that at the time the well was abandoned by the defendant it was still a producing oil well, then the defendant would have no right to pull the casing and plug the same without plaintiff's consent. The defendant could not be compelled under the law to operate said well at a loss, and if it reached a state where the cost of operation was more to the defendant than the income therefrom it would have the right to cease operations, but before destroying it, if it was still producing, it would be the defendant's duty to offer to plaintiff the right of operating the same. Operation at a loss does not mean that the product was paying interest upon the amount invested. Loss in operation under these circumstances would mean that the proceeds derived were not equal to the actual cost of operation."

The principal objection is to that part of the instruction which says that if the jury found that the well when it was abandoned was a producing one, the casing could not be pulled by the defendant without plaintiff's consent, and that before destroying a producing well defendant should have offered plaintiff the right of testing the same. The court was correct in stating that the defendant could not abandon and destroy a producing oil well without

protecting the rights of the plaintiff. The plaintiff had a substantial right in the well, and, besides, this action was brought and tried on the theory that the well had been mishandled by the defendant and practically destroyed before abandonment. It is not a case of abandonment of a properly operated well for the reason that it was not producing sufficient oil to warrant operation. On defendant's theory that the well was prudently operated and was abandoned because it was not producing oil enough to pay for operation, the court gave an instruction that defendant could not be required to operate such a well at a loss. Where there is a question, however, as to whether it could be operated at a profit, the defendant could not cease operation and destroy the well regardless of the rights of the lessor plaintiff. It is a fair and just rule that in such a case the lessee is not permitted to dismantle the operating equipment and pull the casing without offering the lessor the right to test the production and fairly determine whether the well could be profitably operated. It was not a question to be settled alone by the defendant, and the rule laid down by the court is not an unjust requirement, and under the facts of the case is not one of which the defendant has a right to complain.

Certain instructions requested and not given are assigned as error, but they are based on the theory that evidence received was not embraced in the allegations of the petition, but, as already noted, these matters were fairly brought in issue by the pleadings. There was no error in their refusal.

Nor do we find any error in the objections to rulings admitting evidence to which objections were made. Our conclusion is that the evidence supported the findings and the general verdict based on the findings.

There is a cross appeal by plaintiff in which she presents the claim that plaintiff was entitled to more than the one-eighth interest of the oil. That was the interest reserved to her as expressed in the lease. The jury gave her $2,597.40 for her interest in lost production of oil and $2,500 for damages to the oil strata. We think she was not entitled to more than her interest as fixed by the terms of the lease. The claim that she was entitled to eight times the amount awarded, that is, all the oil in place that might be produced from the land, cannot be sustained.

The judgment as rendered is affirmed.

SLOAN, J., not participating.