DALE, et al. *v.* CASE, et ux.

Apr. 20, 1953

No. 38533 28 Adv. S. 9 64 So. 2d 344

*Jones & Stratton,* for appellants.

*Cohn, Hobbs & Hobbs,* for appellees.

KYLE, J.

This case is before us on appeal by John Dale, Jr., and others, defendants in the court below, from a decree of the chancery court of Lincoln County rendered in favor of Zollie M. Case and his wife, Ruby Lee Case, complainants, in which the court held that a mineral deed executed by Zollie M. Case and his wife to John Dale, Jr., on August 10, 1945, did not convey to the grantee therein a present interest in the outstanding oil, gas and mineral leases on the lands described in the mineral deed, but reserved to the grantors therein all rights, rentals and royalties accruing or to accrue to them as lessors under the leases executed prior to the date of said mineral deed. The court in its decree also held that the above mentioned mineral deed was unambiguous, and that the defendants, John Dale, Jr., and his grantees were not entitled to a reformation, as prayed for in their cross bill.

The facts upon which the case was decided are substantially as follows: On August 10, 1945, Zollie M. Case was the owner of approximately 339 acres of land in Section 18, Township 7 North, Range 7 East, in Lincoln County, which consisted of two separate tracts. One

tract of land contained 159 acres and constituted the homestead of Case and his wife; and Case's title to that tract of land was subject to an outstanding oil, gas and mineral lease, which he and his wife had executed on June 19, 1937, in favor of J. H. Harrison, and which had later been assigned to the Stanolind Oil and Gas Company. The other tract of land, containing 180 acres, was a tract of land that Case had purchased from Hugh M. Callender and his wife in 1941; and Case's title to that tract was subject to an oil, gas and mineral lease, which Callender and his wife had executed in favor of the Sun Oil Company on January 21, 1938. Case's title to both tracts of land was also subject to a mineral deed conveyance of an undivided one-half interest in the oil, gas and other minerals on said lands executed by Case and his wife to J. H. Bond on January 23, 1943.

Each of the above mentioned oil, gas and mineral leases covered a primary term of ten years, and was to continue in force as long thereafter as oil, gas or other minerals were produced thereunder. The lease covering the 159-acre tract was to expire on June 19, 1947, unless production was had or drilling operations were begun prior to that date. The lease in favor of the Sun Oil Company covering the 180-acre tract was to expire on January 21, 1948, unless production was had or drilling operations were begun prior to that date.

On August 10, 1945, Case and his wife executed to John Dale, Jr., a mineral right and royalty transfer instrument, in which they conveyed to John Dale, Jr., an undivided 20/339ths interest in the oil, gas and other minerals on the two tracts of land. A printed form was used in the preparation of the mineral instrument, and immediately following the granting clause and the description of the lands there was written into the instrument in typewritten form the following reservation, to wit: "This deed shall not participate in present oil and gas lease, but shall participate in any and all such future leases." The consideration recited in the instrument

was $100.00. R. Lee Stamps represented Dale in the purchase of the mineral interest. Stamps resided in Lincoln County and was secretary of the local Farm Loan Association and also represented the Federal Land Bank of New Orleans in the Brookhaven area. Stamps had had experience in negotiating for the purchase of mineral interests in that area for other persons. Case was a farmer who resided on the 159-acre tract of land; and Case testified that his education ended when he "went to school in the seventh grade at Beaver Creek."

About two months after Dale had purchased the mineral interest from Case, Dale conveyed to R. B. Sharp and R. M. Stricker parts of his mineral interest; and on October 10, 1947, Dale conveyed to Gordon W. Gulmon the remaining part of the mineral interest. These conveyances were made by deeds which contained the same reservation as that embraced in the deed which Dale had received from Case.

During the fall of 1946 a dry hole was drilled on the 180-acre tract of land which was under lease to the Sun Oil Company; and on January 21, 1948, the mineral lease held by the Sun Oil Company on that tract was permitted to expire.

On May 9, 1947, the Stanolind Oil and Gas Company brought in a producing oil well on the Southeast Quarter of the Northeast Quarter of Section 18, which was a part of the 159-acre tract of land occupied by Case and his wife as a homestead. A few weeks later Stanolind prepared and circulated among the owners of royalty rights for their signatures a division order authorizing the payment of royalties to the persons named therein according to their respective interests. This order was dated August 27, 1947. The interest owned by Case and his wife, as shown on the reverse side of the division order, was "99,600/271,200 x 39/40 of 1/8th." Thereafter Case and his wife received a check for $1,568.92 in payment of royalties accrued during the period for which payment was made, and other royalty payments were

made under the division order from month to month until June 1, 1948, when the leasehold interest held by the Stanolind Oil and Gas Company in the 159-acre tract was unitized in what is known as the Brookhaven Field, with the California Company as the operating company. A new division order was then circulated and signed by the royalty owners, and royalties were thereafter paid by the California Company in accordance with the new division order. Case testified that he did not know that he was not being paid the royalty due him on the interest conveyed to Dale, subject to the above mentioned reservation, until sometime during the latter part of 1948 or the early part of 1949, when he learned from Graham Hicks, a representative of the California Company, that he was not being paid the royalty accruing on that interest; and in March, 1949, Case was informed that the royalty interest had been paid by the oil companies to Dale and his grantees.

Case and his wife filed their bill of complaint against Dale and his grantees and the oil companies on April 22, 1949. In their bill the complainants asked that their rights under the reservation contained in the mineral instrument dated August 10, 1945, be recognized and enforced, and that the oil companies be required to pay to them all the royalties due them under the lease dated June 19, 1937, and that the oil companies and the other defendants be required to account to them for the royalties improperly paid to Dale and his grantees prior to the date of the filing of the suit. Separate answers were filed by Dale and his grantees and by the oil companies. Dale and his grantees made their answer a cross bill, and asked that the mineral instrument be reformed so as to show that the reservation contained therein applied only to the delay rentals provided for in the lease dated June 19, 1937, and that it did not apply to the royalties payable under the lease.

There was a sharp conflict in the testimony relating to the above mentioned reservation. Case testified that the

clause was inserted in the instrument at his special instance and request; that it was his purpose and intention to reserve to himself all rights and benefits that he was entitled to under the oil, gas and mineral leases then outstanding; and that it was understood that none of the rights and benefits accruing or to accrue to him under the oil, gas and mineral leases then existing were to be conveyed to Dale. Case testified that he consulted with Mr. C. M. Higdon, vice president of the bank at Brookhaven, and that the language used in the reservation was dictated to him by Mr. Higdon, and taken down by him in a little fertilizer book, which he turned over to Stamps when the deed was prepared.

Stamps, on the other hand, testified that Case wanted to sell the mineral interest on a non-participating basis, that is to say, not participating in the rentals under the existing leases; that he called Dale on the telephone about the matter; and that Dale dictated to him over the telephone the clause which he inserted in the mineral instrument. Both Case and Stamps testified that the instrument was prepared by Stamps in Stamps' office, and that Case and his wife signed the instrument in Stamps' office. Case testified that Stamps paid him $2,050.00 in money for the mineral rights conveyed to Dale in the instrument. Stamps testified that he paid Case $2,300.00. Stamps stated that Dale understood that the non participating clause in the instrument applied only to delay rentals. Stamps testified that he intended to purchase for Dale a "non participating royalty interest, that is non participating as to delay rentals under the present leases," leases outstanding at the time the mineral instrument was signed. Stamps was asked why he had inserted the clause in this particular form. He said, "Well, Zollie wanted something to show there in his deed that the delay rentals under the lease there would not be conveyed." Case testified that he told Stamps, "I'm holding everything now under the present leases, and you can get what's under the future leases."

Case's testimony was corroborated by the testimony of his wife.

The chancellor on the conflicting testimony found in favor of the complainants. The chancellor in his opinion stated that the mineral instrument contained the language insisted upon by both parties; and that the outstanding feature of the conveyance was that the purchaser would not get any of the rights under the existing leases, but would acquire whatever rights the deed carried under all future leases; and that the construction of the mineral instrument, which Case contended for, was not unreasonable. The chancellor pointed out that Dale was a dealer in mineral rights, accustomed to taking chances, and that the chance that he had taken on the 180-acre tract had worked out in his favor, but that the chance that he had taken on the 159-acre tract had not worked out in his favor. And, upon the basis of these findings, the chancellor held that the mineral instrument meant what it said, and that Dale, who had accepted the conveyance subject to the reservation, obtained none of the rights under the existing leases, none of the royalties.

The chancellor entered a decree in accordance with the above mentioned findings. The chancellor found, however, and the decree so stated, that, in view of the fact that the royalties which had accrued prior to the date of the filing of the complainant's bill had been paid over by the operating companies to the owners pursuant to the terms of the division orders which Case and his wife had signed, the complainants were not entitled to a decree against the oil companies for the amounts of royalties paid to Dale and his grantees prior to the date of the filing of the bill of complaint, but that the complainants were entitled to a decree against Dale and his grantees for the amounts which had been paid to them.

The appellants' attorneys in their brief admit that the sole-question to be decided by this Court on this appeal is whether, under the mineral instrument dated August 10, 1945, Dale and his grantees were entitled to

share in the royalties accruing from the production of oil and gas under the mineral lease dated June 19, 1937.

The appellants' attorneys argue three points in support of their contention that Dale and his grantees are entitled to share in the royalties and other benefits derived from the production of oil and gas under the lease dated June 19, 1937: (1) That the attempted reservation contained in the mineral instrument dated August 10, 1945, is repugnant to the granting clause, and is therefore void; (2) that the mineral instrument, although ambiguous and contradictory in its terms, nevertheless conveyed to the appellant, John Dale, Jr., an undivided 20/339ths interest in all rights, royalties and other benefits accruing or to accrue to the appellees, as lessors, under and by virtue of the mineral lease dated June 19, 1937; and (3) that the appellant, John Dale, Jr., was entitled to have the mineral instrument reformed to carry out the intention and agreement of the parties.

We think that there is no merit in the argument that the mineral instrument dated August 10, 1945, is void, because the attempted reservation is repugnant to the granting clause. The language of the reservation is plain and unambiguous, and its meaning we think can be determined without resorting to arbitrary rules of construction. ▆▆ The rule of construction that, where two clauses of a deed are repugnant, the first must prevail, or that an attempted reservation is void when repugnant to the granting clause, cannot be invoked where, from an examination of the whole instrument, the intention of the parties thereto is plain. Hart v. Gardner, 74 Miss. 153, 20 So. 877; Massey, et al. v. Whittaker, 126 Miss. 99, 88 So. 518; Moss v. Jourdan, 129 Miss. 598, 92 So. 689; Federal Land Bank of New Orleans v. Cooper, 190 Miss. 490, 200 So. 729. This Court has held in many cases that the construction of a deed should be upon the entire instrument, and each word and clause therein should be reconciled and given a meaning, if it can be reasonably done. Gulf & S. I. R. Co. v. Patten, 180 Miss.

756, 178 So. 468; Sumter Lumber Co. v. Skipper, 183 Miss. 595, 184 So. 296, 184 So. 835; Richardson v. Moore, 198 Miss. 741, 22 So. 2d 494; Salmen Brick and Lbr. Co., Ltd. v. Williams, 210 Miss. 560, 50 So. 2d 130.

In the case of Federal Land Bank of New Orleans v. Cooper, et al., supra, the Court had under consideration a deed of conveyance from the Federal Land Bank to Cooper in which the grantor had inserted immediately after the description of the lands a reservation as follows: ''One-half interest in all minerals is reserved to the grantor;'' and in answer to the appellees' contention that the exception of the minerals from the deed was inconsistent with and repugnant to the granting clause, the Court in that case said: ''The appellees say that the exception of the minerals from the conveyance is inconsistent with and repugnant to the prior clause therein by which the land is conveyed. This contention is ruled adversely to the appellees in Moss v. Jourdan, 129 Miss. 598, 92 So. 689, 690, wherein the Court said, in dealing with an exception similar to the one here, that the rule here invoked is subject to the 'well-settled qualification that an election cannot be made between repugnant and inconsistent clauses ''if they can be made to harmonize with the general purpose and scheme of the parties as derived from the whole instrument.'' . . . This qualification of the rule controls here, for it is manifest from the face of the deed that the grantors intended thereby, and the legal effect of the language they employed is, to convey the land described therein except all mineral that may be therein or thereon'.''

But even if the provisions of the mineral instrument could not be determined with reasonable certainty without resorting to arbitrary rules of construction, the appellants would be confronted with the generally recognized rule that ''when the written provisions of a contract cannot be reconciled with the printed provisions, the written provisions control.'' Atlantic Terra Cotta Co. v. Goetzler, et al., 150 Wis. 19, 136 N. W. 188, Ann.

Cas. 1913E 958; McNear v. McComber, 18 Iowa 12; Cummings v. Dearborn, 56 Vt. 441; Sylvester v. Ammons, 126 Iowa 140, 101 N. W. 782. "It is a well settled rule of law that where part of a contract is written and part is printed, and the written and printed parts are apparently inconsistent, or there is reasonable doubt as to the sense and meaning of the whole, the words in writing will control the construction of the contract. . . . The reason why greater effect is given to the written than to the printed part of a contract, if they are inconsistent, is that the written words are the immediate language and terms selected by the parties themselves for the expression of their meaning, while the printed form is intended for general use without reference to particular objects and aims." Note: Ann. Cas. 1913E, p. 961. See also 16 Am. Jur., p. 538, Deeds, par. 178; 26 C. J. S., p. 331, Deeds, par. 85; and cases cited.

As to the second point argued by the appellants' attorneys, we think that the chancellor was justified in holding that the reservation expressed the intention of the parties, and that under the reservation the grantee in the mineral instrument was not entitled to participate in the rentals, royalties and other benefits accruing or to accrue to the grantors under the existing leases.

But the appellants say that, if the reservation is to be construed to have such far-reaching effect as we have indicated, the reservation is as large as the grant itself, and is therefore void. But that contention is unsound. Moss v. Jourdan, supra. The reservation applied only to the rights and benefits to be derived from the existing leases. The reservation did not affect the reversionary mineral interests. After Case and his wife executed the oil, gas and mineral lease to J. H. Harrison on June 19, 1937, they had three distinguishable legal interests in the land and minerals. They had their ownership of the land subject to the lease, the right to receive the rentals and royalties under the lease, and a reversionary fee interest in the minerals in place. 3 Summers, Oil and Gas, Perm.

Ed., p. 486, Sec. 601; Koenig v. Calcote et ux., 199 Miss. 435, 25 So. 2d 763. Section 831, Code of 1942, provides that ''Any interest in or claim to land may be conveyed to vest immediately or in the future, by writing signed and delivered.'' And in the case of Ricks v. Merchants National Bank & Trust Company of Vicksburg, 191 Miss. 323, 2 So. 2d 344, the Court held that under the above mentioned statute a possibility of reverter is alienable by means of a deed. When Case and his wife executed the mineral instrument on August 10, 1945, they conveyed to Dale a part of their reversionary interest in the minerals on the land, which they still owned. They did not convey to Dale any of the rights, rentals, royalties or other benefits reserved to them under the mineral lease of June 19, 1937, which was being kept alive by the payment of delay rentals by the lease holder and under which oil was produced in 1947.

Again, the appellants argue that the reservation in the mineral deed of August 10, 1945, was intended to cover only the annual delay rentals; payable under the existing lease, and that the Court should so hold. But Case and his wife both denied that the reservation was intended to apply only to the delay rentals; and the language of the reservation does not justify the claim that the reservation was to be construed that way. The reservation, as it was written, covered not only the delay rentals, but also the royalties and other benefits to accrue under the lease so long as the lease was kept alive; and Dale and his grantees were not entitled to participate in any of those benefits. Dale was under no obligation to purchase the mineral interest subject to such reservation. But drilling for oil was under way in the Brookhaven Field, and, as the chancellor stated, Dale was willing to take a chance. Dale accepted the mineral instrument which Case and his wife were willing to sign. And it is the duty of the Court to construe the instrument as it is written. Abney v. Lewis, 213 Miss. 105, 56 So. 2d 48.

■■ Finally, the appellants' attorneys contend that, when Case and his wife signed the division orders, and failed to register a protest on account of the failure of the division orders to show Case's ownership of the royalty rights under the lease in the mineral interest conveyed to Dale, they thereby assented to Dale's interpretation of the reservation clause in the mineral deed. But, as we have already stated, in our opinion the meaning of the reservation in the mineral deed which Dale accepted is clear, and Dale was not entitled to the royalty payments to be made under the existing lease. Dale acquired no greater rights as a result of Case's signing of the division orders. Dale was not entitled to profit by the mistakes made by the operating companies in the preparation of the division orders or by Case's failure to discover the mistakes before signing the orders. The fractions appearing on the reverse side of the division orders which Case signed might have puzzled the mind of a bank president, such as Higdon, who was accustomed to dealing in figures of that kind; and we do not think that Case, whose formal education had not extended beyond the seventh grade, lost the rights reserved to him in the mineral instrument because of his failure to detect the error in the royalty interest set opposite his name on the reverse side of the division orders sent to him by the oil companies. Case, after signing the division orders, was estopped from asserting a claim against the oil companies for the amounts paid to Dale prior to the filing of the bill of complaint, but Case was not estopped from asserting his rights against Dale and his grantees who were not entitled to the royalties which were being paid to them.

■■ Finally, the appellants contend that the court should have granted a reformation of the mineral instrument, as prayed for in the appellants' cross bill. But there is no evidence in the record to support the appellants' claim for a reformation. The evidence does not indicate that the clause in controversy was inserted in the instru-

ment by mutual mistake; and there was no proof of fraud or inequitable conduct on the part of Case in procuring the insertion of the reservation in the deed. The proof on the other hand clearly shows that the clause in controversy was discussed by Case and Stamps before it was inserted in the deed, and that it was actually inserted in the deed by Stamps, who was acting for Dale in the purchase of the mineral interest. The chancellor was therefore clearly justified in denying a reformation.

For the reasons stated above, the decree of the lower court is affirmed.

Affirmed.

*McGehee, C. J.,* and *Roberds, Lee, Holmes, Arrington* and *Ethridge, JJ.,* concur.

*Lotterhos, J.,* took no part.