No. 40,671

EMMA WAGNER, ARLYN R. MILLER, HOWARD WAGNER, and PHILLIP DALE WAGNER, *Appellees*, v. SUNRAY MID-CONTINENT OIL COMPANY, Successor to Mid-Continent Petroleum Corporation; L. W. SCHNEIDER and H. R. WOODWARD, *Appellants*.

(318 P. 2d 1039)

Opinion filed December 7, 1957.

*John F. Curran,* of Tulsa, Oklahoma, and *Hugh P. Quinn,* of Wichita, argued the cause, and *M. Darwin Kirk,* of Tulsa, Oklahoma, *Vincent G. Fleming,* of Larned, *W. Getto McDonald, William Tinker, Arthur W. Skaer, William Porter* and *John Lancelot,* all of Wichita, were with them on the briefs for appellants.

*Harry E. Robbins, Jr.,* of Wichita, argued the cause, and *Ora D. McClellan, Gerald L. Michaud, Carol V. Creitz, John B. Wooley, Dan J. Skubitz,* all of Wichita, and *Ray McCombs,* of Ness City, were with him on the briefs for appellees.

The opinion of the court was delivered by

FATZER, J.: This was an action to quiet title to real estate in Rush County, Kansas. The question presented is whether the cessation of production of oil from the property on September 30, 1953, following the expiration of the primary term of the mineral interests involved, was a permanent cessation of production causing a reversion of those interests to the original grantors pursuant to the terms of two mineral deeds conveying such interests for fifteen and twenty years, respectively, and "as long thereafter as oil and/or gas is produced from the premises or the property is being developed or operated." The trial court quieted title in the plaintiffs, and the defendants have appealed.

On January 12, 1932, Phillip H. Wagner and Emma Wagner, being the owners of the full mineral interest in the northwest quarter

of section 28, township 18 south, range 16 west, conveyed an undivided one-half interest in the oil, gas and other minerals in and under and that may be produced from the quarter section, for a period of twenty years and as long thereafter as oil and gas is produced from the premises. By mesne conveyance that undivided one-half interest was acquired by the defendant (appellant) Sunray Mid-Continent Oil Company, hereafter referred to as Mid-Continent, the successor to Mid-Continent Petroleum Corporation.

On February 24, 1937, Phillip H. and Emma Wagner conveyed to defendant (appellant) L. W. Schneider an undivided one-eighth interest in and to all oil, gas and other minerals in and under and that may be produced from the same quarter section for a term of fifteen years and as long thereafter as oil and gas is produced from the premises or the property is developed or operated. Later and on March 12, 1938, Schneider and his wife Alma conveyed to defendant (appellant) H. R. Woodward an undivided one-sixteenth interest in the oil, gas and other minerals in and under the property involved for a term of fifteen years from February 24, 1937, and as long thereafter as oil or gas is produced from the premises or the property is being developed or operated.

On November 29, 1945, Phillip H. and Emma Wagner together with Woodward and his wife Dora, and Schneider and his wife Alma, executed and delivered an oil and gas lease covering the quarter section to J. F. Mergen. On January 4, 1946, Mid-Continent executed an oil and gas lease in favor of Mergen covering the property involved.

On February 25, 1946, Mergen assigned the Wagner oil and gas leases to Darby & Bothwell, Inc. reserving a production payment of one-sixteenth of seven-eighths of all oil and gas produced until the sum of $16,000 had been paid.

On May 22, 1946, Darby & Bothwell, Inc. completed an oil well known as Wagner A-1 capable of producing oil in commercial quantities from a location in the northeast quarter of the northeast quarter of the quarter section, which production ceased on September 30, 1953, as hereafter set forth. Wagner A-1 was the only well drilled by Darby & Bothwell on the Wagner lease.

In July, 1953, J. F. Darby Oil Company, hereafter referred to as Darby, successor to Darby & Bothwell, Inc., operator of the leases covering the quarter section, reworked Wagner A-1 by fracturing the well with sand and oil, resulting in the production of large

quantities of water and no oil. On September 29, 1953, the well was again reworked and when tested the following day, produced 40 barrels of fluid per hour, 95 percent water and 5 percent oil, resulting in Darby's shutting the well in.

During October, 1953, Vernon W. Weber, the owner of an offset well adjoining the Wagner quarter section, upon learning that Darby intended to abandon the well and remove its equipment, called Darby's office in Tulsa, Oklahoma, and offered to purchase the leases with the casing in the well at salvage value. On October 19, 1953, Darby wrote Weber the following letter:

"Our Mr. W. V. Kent has advised us that you called him inquiring as to our plans regarding the above lease. We have now had word from both of our partners in the lease and have determined that we will abandon it.

"If you are interested in purchasing the well for use as a salt water disposal well, we will be glad to assign the lease to you at a cost to you of $3,300.00.

"We intend to remove all surface equipment and you would be purchasing only the hole with 3623' of 5½" J-55 casing as it now stands.

"This tract is covered by several part-interest leases and, if you are interested, we suggest that you check these on the records there at LaCrosse.

"Please give us an answer as soon as possible so that, if you are not interested in this purchase, we may proceed with the plugging and abandonment of the well."

Following receipt of the letter, Weber and his associates, hereafter referred to as Weber, purchased the leases with the casing in the well for $3,300, and Darby assigned them to him. On November 25, 1953, Weber filed those assignments of record in Rush County, and on December 21, 1953, obtained a top oil and gas lease from the plaintiffs covering the quarter section.

When Weber purchased the Wagner leases from Darby there was no oil production from the property and there was no equipment on the property for that purpose; there was only a concrete foundation, pipe in the hole, which was capped but not plugged, and a small pond.

In April, 1954, Weber commenced reworking Wagner A-1 with the idea of making it a commercial well. About 60 days later they obtained production and oil was first sold from the property in August, 1954.

In July, 1954, after Weber commenced reworking Wagner A-1, he made partial assignments of undivided interests in the original oil and gas leases from Wagner, Schneider, Woodward and Mid-Continent and the 1953 Wagner top oil and gas lease, to numerous

parties. At the time of the trial Weber was operating the quarter section under the original leases and the 1953 Wagner top lease.

In August, 1954, the Stanolind Oil Purchasing Company, which had purchased the oil produced from the quarter section prior to 1953, circulated two new division orders for the purchase of crude oil; one, from the east half of the quarter section designated as Wagner "A"; the second, from the west half of the quarter section designated as Wagner "B," since different ownerships of the working interests in the leases of those two tracts required that separate records be kept of oil purchased from them. The division orders were signed by the plaintiffs (Phillip H. Wagner having died, the reversionary rights, including his interest in the minerals in the quarter section, passed to and became vested in plaintiffs as his sole heirs), and by Mid-Continent, Schneider and Woodward, together with other persons not involved in this controversy, as the owners of the one-eighth royalty interest, and authorized Stanolind to make payment of oil purchased from each tract as follows: one-fourth to the plaintiffs, one-half to Mid-Continent, and one-sixteenth to each Schneider and Woodward. Stanolind made payments to the parties to this litigation for their share of oil purchased from the quarter section pursuant to the division orders until March 1, 1955, when it was notified of the pendency of this action, and since then it has suspended royalty payments.

Trial was by the court, and when the plaintiffs rested their case the defendants demurred to the evidence, which was overruled. Thereafter the defendants introduced their evidence, and rested. Following the trial, the district court made findings of fact and conclusions of law, which, omitting findings of fact No. 1 as not here material, read:

"FINDINGS OF FACT

"2. Was 'The well temporarily shut down for repairs, or, was it permanently shut down with the idea that no attempt would be made to put it back on pump?' (*Wilson v. Holm*, 164 Kansas 229, at 238). In July, 1953, the well was producing seven barrels of oil a day and was, therefore, not profitable to operate. In an attempt to increase production it was plugged back and fractured with oil and sand. The well then produced forty barrels of fluid an hour, but only five percent was oil and ninety-five percent was water. Because of the large amount of water the well was, again, not a commercial well.

"3. The Darby Oil Company decided, in October, 1953, to abandon the well and plug it (letter of Brown to Weber, dated October 19, 1953. Plaintiff's Exhibit 3). The Darby Oil Company pulled the rods and removed all pumping equipment and sold its lease to Vernon Weber, for $3,300 (the esti-

mated value of the casing in the well). The lease was purchased by Mr. Weber with an intention of making use of the hole as a salt water disposal well, should his operations on adjoining real estate make it necessary to have a salt water disposal well. About the First of April, 1954, Weber and his associates decided to try and make it a commercial well. In this attempt they were successful. From October, 1953, until April, 1954, we have a cessation of production with 'the idea no attempt would be made to put it back on pump.' This, in accordance with *Wilson v. Holm,* would be a permanent abandonment of the well.

"CONCLUSIONS OF LAW.

"1. The signing of the division orders by the plaintiffs, and the acceptance of payments under these orders, do not estop the plaintiffs from seeking the relief asked for in their petition. The evidence fails to show the necessary elements of an estoppel, either legal or equitable.

"2. The plaintiffs are entitled to recover judgment as prayed for in their petition."

Judgment was entered in harmony with the district court's findings of fact and conclusions of law quieting title in the plaintiffs to the quarter section. Following the overruling of their motions to set aside findings of fact and conclusions of law and for a new trial, the defendants have appealed.

Defendants' first contend that the district court's findings of fact were not supported by substantial competent evidence; further, that the last sentence of finding No. 3, "This, in accordance with *Wilson v. Holm,* would be a permanent abandonment of the well" was a conclusion of law rather than a finding of fact.

We do not deem it necessary to make a detailed review of the evidence. The record indicates this was a close case, and that there was testimony from which the district court could have found for either party. The fact is, after hearing the testimony, the district court found that the cessation of production, which occurred September 30, 1953, was a permanent cessation as contended by the plaintiffs rather than a temporary cessation as urged by the defendants. In this connection, the evidence established that in July, 1953, Darby was not satisfied with the production of seven barrels of oil per day and in an attempt to increase production, plugged back the well and fractured it with sand and oil. After fracturing the well, it produced nothing but water. The well was reworked in an effort to save it, and when tested September 30, 1953, it produced immense quantities of water and a small amount of oil. Since Darby had no facilities to handle the volume of water it encountered, it was determined the well was no longer a commercial producer,

and had Darby not sold its leases to Weber, it would have plugged the well and abandoned it. Weber testified that he purchased the leases and the well for the salvage price of the casing, to be used for salt water disposal should his operations on his adjoining lease require it, and that at the time of the purchase he had no intention of reworking it as an oil well. The evidence further showed that sometime after the first of the year of 1954 Weber discussed whether they would use the well as a salt water disposal or rework it; and, in April, 1954, it was decided to rework the well. The district court was entitled to use Weber's testimony as to *purpose* in connection with his testimony as to *acts*, to make a finding as to his *intention*. Obviously, Weber wanted to be secure in his adjoining lease in the event he needed the well for salt water disposal and he obtained the top oil and gas lease from the plaintiffs in December, 1953. He was aware Darby had ceased production on September 30, 1953, with the idea to never again produce the Wagner property. Our examination of the entire record convinces us there was substantial competent evidence to support the district court's findings that when Darby shut the well down on September 30, 1953, it was not a commercial well; that when Weber purchased the leases he had no intention of reworking it as an oil well and intended only to use it for salt water disposal purposes should his operations on his adjoining lease require it; that from September 30, 1953, to the middle of June, 1954, a period of more than eight months, there was no production from the well; that from September 30, 1953, until April, 1954, no one entertained the idea of attempting to put the well back on a pump, which, together with other supporting evidence, fully justified the district court in finding that the well had ceased to produce, not temporarily, but permanently; and being a question of fact and having the support of substantial competent evidence, that finding must be upheld (*Wilson v. Holm,* 164 Kan. 229, Syl. ¶ 4, 188 P. 2d 899).

With respect to the last sentence of finding No. 3, the district court is authorized by G. S. 1949, 60-2921 to make findings of fact and conclusions of law. Cases which enunciate the duty of the district court under the statute hold that it is not required to make findings of evidentiary facts, only conclusions of facts, or ultimate facts. (*Prescott v. Leonard,* 32 Kan. 142, 145, 4 Pac. 172; *Nordman v. Johnson,* 94 Kan. 409, 146 Pac. 1125; *Alexa v. Alexa,* 108 Kan. 38, 193 Pac. 1083; *Ford, Adm'x v. Peck,* 116 Kan. 74, 225 Pac. 1054;

*Jernberg v. Evangelical Lutheran Home for the Aged,* 156 Kan. 167, 131 P. 2d 691.) In *Prescott v. Leonard,* supra, it was said:

". . . All findings of fact are necessarily mere conclusions or inferences drawn from the evidence; that is, drawn from other facts. It is therefore not a valid objection to a finding that it is the finding of a compound fact, or a complex fact, or a comprehensive fact, and including many minor and subordinate facts; or that it is a conclusion or an inference from the evidence or from other facts, for all findings must necessarily be subject to these same objections. (*Railroad Co. v. Plunkett,* 25 Kan. 188.) The finding, though a general one, is a conclusion of fact of a complex character, drawn from a variety of other facts more simple and less complicated in their nature. . . ." (l. c. 145.)

We think the last sentence of finding No. 3 is a finding of the ultimate fact that the cessation of production was permanent, and is not a conclusion of law.

Defendants next contend that a temporary cessation of the marketing of production of oil or gas following the expiration of the primary term of a term mineral interest does not warrant termination or extinguishment of that interest. In making the contention, defendants concede that under our holding in *Wilson v. Holm,* supra, the question of whether there is a temporary or permanent cessation of production is one of fact to be determined by the district court, but argue that while the well was making approximately 800 barrels of salt water per day, it was also capable of producing approximately 42 barrels of oil per day, and production had not ceased in the sense that the well was dry or incapable of producing oil in commercial quantities, but that it was only a temporary cessation of the marketing of production due to the engineering problem of cutting off the water or disposing of it, which was produced with the oil, and did not constitute a forfeiture of the interests of the defendants.

The defendants assume the cessation of production was temporary because the well was capable of producing oil, and that approximately nine months later production was resumed.

The mineral conveyances here involved created a base or determinable fee. It is well settled in this jurisdiction that when a mineral deed has terminated because of failure to produce oil or gas, the court will not extend the term or revive rights which the parties themselves have definitely fixed by their contract (*Kahm v. Arkansas River Gas Co.,* 122 Kan. 786, 253 Pac. 563; *Ratcliff v. Guoinlock,* 136 Kan. 149, 12 P. 2d 798; *Wilson v. Holm,* supra), and

when a mineral deed has terminated because of cessation of production, it is not revived by subsequent production of oil even though it be in the same well (*Wilson v. Holm*, supra).

The defendants insist that the instant case comes within the exception announced in *Wilson v. Holm*, supra, that if there is a temporary cessation of production caused by failure of a lessee to produce because of neglect, poor judgment, fraud, connivance with the owners of other mineral interests, voluntary abandonment of the lease, or any unjustified reason over which the grantees of the term mineral interests have no control, the term mineral interests are not terminated. The leading case on this question is *Wilson v. Holm*, supra, where the question was whether a term mineral interest had terminated by reason of a cessation of production following the expiration of the primary term. A review of the facts of that case will not be made except we note the factual situation there involved is strikingly similar to that presented in the instant case. There, as here, production had ceased, the casing was not pulled and the well was not plugged; also, the pumping equipment and tubing were removed. There, the well was capable of producing oil after reworking, and production was subsequently resumed. In sustaining the findings of the district court that the cessation of production was permanent, it was said:

"Obviously since production under a lease depends in the first instance upon action or inaction on the part of the lessee and since the ultimate test as to whether an estate created by a deed has terminated depends entirely upon its own provisions, it must follow that the parties to a mineral deed, providing the estate conveyed to the grantees shall continue so long as oil is produced in paying quantities, do not contemplate that failure of a lessee to produce oil in paying quantities works a defeasance *ipso facto*. To hold otherwise would mean that failure of the lessee to so produce because of neglect, poor judgment, fraud, connivance with the owners of other mineral interests, voluntary abandonment of the lease, or any unjustifiable reason over which the grantees had no control, would have that result. That, however, does not mean that owners of mineral interests can sit idly by and do nothing when the lessee ceases to operate or production stops for any other reason. Neither does it mean, as appellants contend, that any cessation which is resumed at some future date cannot be deemed permanent but must be construed as temporary for that construction would result in a nullification of the defeasance clause itself. *We believe proper construction of such an instrument requires the conclusion that if for any reason there is a cessation of production of oil in paying quantities on the land covered by its terms the owners of the minerals in place are required to move promptly and by their efforts actually establish that such cessation, regardless of its cause, is tem-*

*porary, not permanent.* In the event of their failure to do so, it is our view production as contemplated by the parties is to be regarded as having ceased, their conveyance terminates and any estate theretofore held by them under and by virtue of its terms reverts to the grantors." (l. c. 239, 240) (Emphasis supplied.)

In their brief the defendants assert that Darby was negligent in its handling of the well and in failing to produce it after it was reworked September 29, 1953, and that he wrongfully abandoned it. The contention is without merit. No evidence was offered by the defendants to show that when Darby shut down the well it could have been operated at a profit and that by the exercise of reasonable diligence the excessive salt water could have been disposed of by a prudent operator without unreasonable cost to him when measured by the value of the marketable oil produced under such circumstances. Darby was not required to operate the well at a loss (*Fischer v. Magnolia Petroleum Co.,* 156 Kan. 367, 373, 133 P. 2d 95), and the district court's finding that the well, after it was reworked in September, 1953, was not a commercial producer was supported by substantial evidence. As previously indicated, the findings of the district court that the cessation of production was permanent was sustained by sufficient competent evidence, and the point urged by defendants cannot be upheld.

The defendants assume, *arguendo,* that if there was a permanent abandonment of the well, the plaintiffs, as the owners of the reversionary interest, were not entitled to terminate the term mineral interests by reason of the wrongful act of the operator in failing to notify them of an intention to abandon the property, and cite *Warner v. Shell Petroleum Corp.,* 132 Kan. 837, 297 Pac. 682. That was an action by the lessor to recover damages from the lessee for the negligent destruction of a well alleged to be capable of producing oil. The case was not one of abandonment of a properly operated oil well for the reason that it was not producing sufficient oil to warrant operation, but was tried on the theory that it had been mishandled by the lessee and practically destroyed before abandonment. That is not the case here. The defendants offered no evidence that Darby negligently operated the well, or that it was wrongfully abandoned without offering them the right to test production to determine whether it could be profitably operated.

Under the rule announced in *Wilson v. Holm,* supra, the defendants were required to move promptly and by their efforts es-

tablish that the cessation of production, regardless of its cause, was temporary and not permanent. As the record is silent in this respect, we can only conclude that the defendants did nothing. The fact remains that production ceased September 30, 1953, and despite the fact the defendants did not receive royalty checks from the leases for over a period of approximately ten months, they took no action to establish that cessation of production was temporary rather than permanent. Furthermore, Schneider's testimony was that, although he lived in the vicinity of the well and passed it as frequently as once a week, he did not know what month of the year it was that he observed work being done on the well. The defendants may not excuse their failure to move promptly by here contending there was a wrongful abandonment of the well without notice to them, an issue which they did not see fit to prove.

The defendants assert the owners of the reversionary interests were not entitled to terminate the term mineral interests on the ground of a cessation of production when such cessation was due to the failure of the lessee to comply with the implied covenants of the leases to drill offset wells.

It is elementary that the lessee has a duty, based upon the implied covenants of a lease, to protect his lessor from drainage, which protection is usually afforded by means of offset wells. Assuming, *arguendo,* the record showed that the implied covenants of the leases to drill a well offsetting the Weber well on the adjoining quarter section were breached, this action is not the one for the defendants to complain of that wrong. They could have made timely complaint of that breach, if there was one, to the lessee, or could have proceeded against the lessee to require the drilling of an offset well, or canceled the lease for violation of the implied covenants to develop. However, the lessee's breach of the implied covenants, if there was one, is no more imputable to the owners of the reversionary interest than it is to the owners of the term mineral interests, and the presence or absence of a duty on the part of the lessee to drill an offset well had nothing to do with a defeasance of the term mineral interests when production was the test to determine the continuation of such interests.

Defendants assert plaintiffs were estopped from claiming termination of the term mineral interests by reason of their execution of the division orders, which credited plaintiffs with a one-fourth royalty interest and credited defendants with their respective in-

terests heretofore set forth, and plaintiffs' acceptance of payment on that basis until March 1, 1955, when Stanolind was notified of the pendency of this action. They argue that those acts indicated plaintiffs' recognition of the validity and existence of defendants' term mineral interests, and cite *Tamsk v. Continental Oil Co.* 158 Kan. 747, 150 P. 2d 326.

A division order is an instrument required by the purchaser of oil or gas in order that it may have a record showing to whom and in what proportions the purchase price is to be paid. Its execution is procured primarily to protect the purchaser in the matter of payment for the oil or gas, and may be considered a contract between the sellers on the one hand and the purchaser on the other (*Stanolind Oil & Gas Co. v. Terrell,* 183 S. W. 2d 743 [Texas]; *Williams' Adm'r v. Union Bank & Trust Co.,* 283 Ky. 644, 143 S. W. 2d 297; 3 Summers, Oil and Gas, § 590 [1938]). Generally speaking, a division order is not a contract between sellers themselves, especially in view of the fact that each of the parties having an interest in production may in fact execute separate division orders (*Williams' Adm'r v. Union Bank & Trust Co.,* supra; *Dale, et al. v. Case, et ux.,* 217 Miss. 298, 64 So. 2d 344; *Hershey v. Hershey,* 3 Ill. Apps. 2d 307; *Snider v. Snider,* 208 Okla. 231, 255 P. 2d 273; *Stanolind Oil & Gas Co. v. Terrell,* supra).

Although a seller would be estopped from asserting a claim against the purchaser by his execution of a division order, absent special circumstances, a seller is not estopped from asserting a greater interest as against the other sellers where he executed the division order on the basis of a mistake of fact as to the extent of his interest when the division order was prepared by the purchaser, nor is the division order considered to be a conveyance of an interest to the other sellers (*Williams' Adm'r v. Union Bank & Trust Co.,* supra; *Dale, et al v. Case, et ux.,* supra; *Hershey v. Hershey,* supra; *Snider v. Snider,* supra; *Stanolind Oil & Gas Co. v. Terrell,* supra). *Hershey v. Hershey,* supra, was an action by a cotenant in an oil tract for an accounting of royalties paid to other tenants under a division order signed by the parties, wherein it was said:

"As stated by Professor Summers in his work on Oil and Gas (Vol. 3, at page 423), where the signers of a division order are cotenants of the oil, 'there seems to be no basis for saying they are contracting with each other.' The author goes on to state that by signing a division order it would seem that a person admits the amount of oil set apart to him therein, but expresses no intention to convey or transfer any portion thereof to any other person. It

is apparent to us that it would be improper to permit the cotenants to profit by a mistake made by the Oil Company in preparation of a division order, or by the plaintiff's failure to discover the mistake before signing the order. It is true that plaintiff would be estopped from asserting a claim as against the Oil Company, but he certainly was not estopped from asserting his rights as against his cotenants, who were not entitled to the royalties which were being paid to them. . . ." (pp. 309, 310.)

Here, plaintiffs were not estopped from claiming a termination of the term mineral interests. Our decision in *Tamsk v. Continental Oil Co.*, supra, does not control the question in the case at bar. In that case plaintiff sought to cancel a one-sixteenth *working interest* in an oil and gas lease. The fact that any order of cancellation would operate only against this one-sixteenth interest and would not affect the holders of the balance of the working interest, influenced the court's decision. Although the court declared that plaintiff's signing of the division order estopped him from questioning defendants' right to the one-sixteenth interest, the elements of reliance to the detriment of the defendants were present in that case. Ownership of a working interest imposes on the holder a duty to expend time and money in drilling and operating the well or wells. Execution of the division order will induce him to make such expenditures, not only to fulfill his implied covenants but to secure profits from the operation himself. Here, rather than reliance by the defendants to their detriment, plaintiffs' signing of the division orders in fact gave them a benefit to which they were not entitled.

We are of the opinion that under the facts and circumstances the execution of the division orders by the plaintiffs as the owners of the reversionary interest to the purchaser of the oil produced, following a permanent cessation of production, which erroneously recognized the existence of the defendants' expired term mineral interests, does not estop the plaintiffs to maintain this action.

It is next contended that the district court made erroneous rulings on the admission of evidence. It is unnecessary to set out at length the questions, the objections, and the district court's rulings thereon, but we have examined those rulings and we find no error.

Next it is contended that the district court erred in overruling the demurrer to the first amended petition. We deem it unnecessary to comment at length upon this contention, or lengthen this opinion by a summary of the allegations of that pleading. We have examined it, and we think it alleged a cause of action against the de-

fendants. Complaint is also made that the district court erred in overruling the defendants' demurrer to the plaintiffs' evidence. As previously indicated, our review of that evidence convinces us there was substantial competent evidence to sustain the findings of the district court and we think the demurrer was properly overruled.

From our examination of the record we conclude the judgment of the district court was correct in that production and development of the Wagner leases had permanently ceased; that the defendants did not move promptly and establish the cessation of production was temporary, not permanent; that the term mineral interests of the defendants were terminated; that such interests were not revived by subsequent production from the well duing June, 1954; and, that defendants' rights under the term mineral conveyances were terminated and such interests reverted to the plaintiffs as the reversionary owners.

The judgment is affirmed.

FATZER, J. (concurring): I fully concur in the majority opinion, but wish to add that in my judgment the defendants may not here contend the plaintiffs, as owners of the reversionary interest, are not entitled to terminate the term mineral interests because Darby failed to notify them of its intention to abandon the well, or that Darby wrongfully abandoned the well when it was capable of producing oil in commercial quantities. Under the record, the contention presents no justiciable issue for appellate review since the defendants did not plead or prove the asserted wrongful acts of the third party operator lessee.

Generally speaking, the rule announced in *Wilson v. Holm,* 164 Kan. 229, 188 P. 2d 899, requires the grantees of minerals in place for a fixed primary term and as long thereafter as oil is produced in paying quantities, or words of similar import, following the cessation of production after the expiration of the primary term, to move promptly and by their efforts establish that the cessation, regardless of its cause, is temporary, not permanent. However, such a conveyance does not contemplate that the failure of a lessee to produce oil in paying quantities works a defeasance *ipso facto* of the term mineral interest, because the cessation of production *may* result from the wrongful or fraudulent acts of the operator lessee in operating or abandoning the property over which the grantees had

no control, in which event a defeasance of their rights might not necessarily occur.

Following the cessation of production, which all concede occurred September 30, 1953, the defendants did not protect their rights in the property although they were charged with knowledge of what was going on. When they ceased to receive royalty payments they were required to ascertain the reason, and to assert their rights promptly and act within a reasonable time (*Wilson v. Holm*, supra), but they did nothing. They here attempt to excuse their failure to act promptly by pointing their finger toward the *asserted* wrongful acts of the operator lessee in failing to notify them of its intention to abandon the well, and of abandoning it when capable of producing oil in paying quantities. That is an affirmative defense which must be specifically pleaded and proved. Since that was not specifically pleaded and proved, nothing is presented for appellate review.